Ronald E. STEWART, Roy Martin and
James Bolden, Plaintiffs,

v.

James A. RHODES, Governor, State of Ohio, George F. Denton, Director, Department of Rehabilitation and Correction, E. Blaine Haskins, Assistant Director, Department of Rehabilitation and Correction, Neil F. Kette, Superintendent, Correctional Medical and Reception Center, David R. McKeen, Superintendent, Columbus Correctional Facility, Roger Overberg, Superintendent, London Correctional Institute, Dorothy Arn, Superintendent, Ohio State Reformatory for Women, Arnold Jago, Superintendent, Southern Ohio Correctional Facility, Ted Engle, Superintendent, Chillicothe Correctional Institute, William H. Dallman, Superintendent, Lebanon Correctional Institute, E. P. Perini, Superintendent, Marion Correctional Institute, and Frank Gray, Superintendent, Ohio State Reformatory, Defendants.

No. C-2-78-220.

United States District Court,
S. D. Ohio, E. D.

July 13, 1979.

Jean P. Kamp, Columbus, Ohio, for plaintiffs.

Allen P. Adler, Leo J. Conway, John C. Stamatakos, Asst. Attys. Gen., Columbus, Ohio, for defendants.

Mary Lynn Walker, Lisbon C. Berry, Jr., Stephen A. Whinston, Adjoa A. Burrow, U. S. Dept. of Justice, Civil Rights Division, Washington, D. C., for United States, amicus curiae.

## MEMORANDUM AND ORDER

DUNCAN, District Judge.

This is a class action brought by inmates of the Columbus Correctional Facility (here-

after CCF) seeking a declaration that the conditions of confinement to which plaintiffs are subjected at CCF amount to cruel and unusual punishment and are in violation of their rights under the Eighth and Fourteenth Amendments to the United States Constitution. Plaintiffs also seek injunctive relief barring further operation of the facility as a correctional institution, and relief in compensatory and punitive damages.

The matter is presently before the Court on plaintiffs'[1] motion for a preliminary injunction with regard to two current practices at CCF which require expedited judicial consideration: (1) the segregation of inmates by race, and (2) the use of certain types of physical restraints on inmates.

The Court has held a hearing on this matter and has heard the argument and received the memoranda of counsel. Upon consideration of all the material presented, the Court, as further detailed below, holds as follows: the practice of segregating prisoners by race is a clear and unjustified violation of the inmates' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and in accordance with the order below is enjoined. Likewise, under certain circumstances, the practice of placing prisoners in restraints in locked cells, as explained below, amounts to the imposition of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution and also must be enjoined. What follows are the Court's findings of fact and conclusions of law in the matter.

## I. Preliminary Statement

The Columbus Correctional Facility is a maximum security state penitentiary located in downtown Columbus, Ohio. The facility, which prior to 1972 was the state's only maximum security prison, is over 100 years old. It presently houses approximately 1700 inmates.

---

1. The Court notes that the motion for preliminary injunction was originally filed by the United States, the court-appointed *amicus curiae* in this case. Subsequently, and prior to the hearing on the matter, plaintiffs also filed a motion for preliminary injunction and joined in the motion of the *amicus*. Accordingly, the Court considers the matter properly before it.

Beyond the alleged problems arising from the age of the physical plant itself, administration of CCF is complicated by the unique nature of the prison's operation. CCF is not simply a correctional institution; it serves as well as a receiving and processing center for other Ohio institutions. Thus, convicted criminals sentenced to an Ohio prison initially pass through CCF. The facility also houses disabled and aged prisoners, receives disciplinary transfers from outlying Ohio institutions, and houses prisoners who are isolated in administrative, punitive and protective custody.

■ The Court is fully cognizant of the problems with which prison administrators, faced with increasing prison populations and decreasing space and funding, must deal. Further, it is clear that federal courts must defer in many matters to the expert judgment of these administrators, particularly in matters of internal security and order. The Supreme Court has recently firmly reiterated this principle:

[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.

*Bell v. Wolfish*, —— U.S. ——, ——, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979).

■ On the other hand it is equally clear that prisoners are not stripped of all constitutional rights at the prison gate. *Wolff v. McDonnell*, 418 U.S. 539, 555–56, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The Court must strike a proper balance between the constitutional rights of plaintiffs in this case and the clear authority of prison administrators to implement procedures necessary to the maintenance of discipline and security. Given the facts of the present case the Court is of the opinion that this balance must weigh in favor of the plaintiffs. Although defendants contend that both the practice of segregation and the use of the type of physical restraints complained of are necessary for institutional security, the Court is not persuaded that such measures are in fact required to preserve internal order and discipline or to maintain institutional security. The Court will now detail its findings and conclusions on the matter.

## II. Segregation

■ Defendants do not deny that segregation by race is an established policy and practice at CCF. Both David McKeen, Superintendent of CCF, and George Denton, Director of the Ohio Department of Rehabilitation and Correction, testified at the hearing that inmates living in double cells are segregated by race in cell blocks G, H, I and K, which comprise the reception area of the facility, and in A and B blocks which are the "maximum unassigned" areas housing disciplinary transfers from medium security institutions. McKeen stated that this practice has been in effect at CCF at least since the time he first became familiar with the institution a decade ago.

The Court does note that cells in other areas of CCF are not segregated, nor are the dormitory living spaces, the limited duty unit, or common areas such as the dining hall.

Superintendent McKeen testified that the practice of segregation at CCF stems from the prison administration's desire to reduce the possibility of racial tension and potential violence which it fears will result from celling black and white inmates together. George Denton testified that double cells are integrated at all other Ohio institutions and have presented no such problems. Yet McKeen explained that because CCF is the initial reception center for inmates coming into the state corrections system, the administration has insufficient information concerning their background to integrate them in the two-man reception cells where officials fear racial bias might flare into

violence.[2] With regard to A and B blocks McKeen stated that inmates housed there have been received as disciplinary transfers, "some" of whom allegedly have been involved in incidents with racial overtones at outlying institutions, and therefore are assigned to cells on the basis of their race in order to reduce possible conflicts.

From all of the testimony introduced at the hearing it appears that the defendants have implemented and continued the policy of segregation at CCF out of a belief that such a practice would reduce tension among the inmates. Nevertheless, the defendants were unable at the hearing to make any showing whatsoever that there is substance to their stated fears. Indeed, because integration has not even been attempted at CCF with regard to reception inmates within at least the past ten years, prison officials could not have had any experience with the effects of integration on which to base their apprehensions.

Upon questioning at the hearing, McKeen admitted that he had not relied on any documented support for the theory that racial segregation reduced tension among inmates. In essence, he acknowledged, the practice is based on his "common sense" attitude toward overall relations between the races.

In the Court's view, however, an equally "common sense" attitude, and one sup-ported by expert testimony at trial,[3] would indicate that segregation of inmates rather than their integration tends to create racial misunderstandings and tensions.

The Court does recognize, however, that there may be instances where prison discipline and order may genuinely be threatened by a particular prisoner's racial animus, and in such situations, for example where there is evidence of the prisoner's prior involvement in race-based violence, his segregation may be warranted.

In support of their position on this matter defendants called as a witness E. Peter Perini, superintendent of the Marion, Ohio, Correctional Institution. Perini stated that pursuant to an order of the United States District Court for the Northern District of Ohio the Marion facility was integrated in 1975. He indicated that after a lottery system of bunk assignments had been instituted, voluntary resegregation tended to occur among the inmates. Perini also attributed a rise in racial tension to the desegregation order. The Court notes that Marion, unlike the CCF reception center, houses its prisoners in dormitory-like living spaces.

The Court has considered the testimony of Superintendent Perini concerning his experience at the Marion facility, but is not persuaded that it is sufficient to justify defendants' practices at CCF. Defendants

2. An inmate normally remains in the reception center for approximately eight weeks. At the time an inmate arrives at the CCF reception center, according to defendants, all that is known about him is his name, his race, the crime he committed and the county in which he was tried. In the Court's view the classification process could be greatly advanced if more information could accompany the inmate from the county where he has been tried and sentenced. In any event, defendants cannot claim a similar lack of information regarding inmates in A and B blocks since those inmates—disciplinary transfers from other institutions—have already been processed into the state correctional system.

3. The Court heard testimony from Dr. David Fogel, a professor of criminal justice at the University of Illinois and consultant on corrections practices. Dr. Fogel testified that in his opinion segregation did nothing to lessen racial tension or violence, and that integration would do more to lessen these tensions than segregation could. Additionally, Fogel stated that Ohio is virtually the only state in which prison segregation is practiced. Subsequent to the hearing defendants moved this Court to strike the entire testimony of Dr. Fogel, claiming that his statements regarding the status of prison integration in other states were inaccurate and misleading. This motion will be denied. The Court notes that defendants had ample opportunity to cross-examine Dr. Fogel at the hearing and to expose any errors in his testimony. In any event, whether or not prison systems in other states are fully integrated is in the Court's view irrelevant to the issue presented in this case. The Court must apply the law as it understands it to the facts of the case before it. Defendants may be assured that Dr. Fogel's testimony regarding practices in other states had no material impact on the Court's findings of fact or conclusions of law concerning the practices at issue in this case.

must remember that it is clearly the law of the land that prison inmates "are protected against invidious discrimination on the basis of race under the Equal Protection Clause of the Fourteenth Amendment," *Bell v. Wolfish, supra,* —— U.S. at ——, 99 S.Ct. at 1877; and that "racial segregation, which is unconstitutional outside prisons, is unconstitutional within prisons, save for the necessity of prison security and discipline." *Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972); *see also, Lee v. Washington,* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1960); *United States v. Wyandotte County, Kansas,* 480 F.2d 969 (10th Cir. 1973), *cert. denied,* 414 U.S. 1068, 94 S.Ct. 577, 38 L.Ed.2d 473 (1973); *Mickens v. Winston,* 462 F.Supp. 910 (E.D.Va.1978).

■ In the present case defendants apparently intend to shield otherwise unconstitutional action behind the "prison security and discipline" exception noted above. Under that exception:

[P]rison authorities have the right, acting in good faith and in particularized circumstances, to take into account racial tensions in maintaining security, discipline, and good order in prisons and jails.

*Lee v. Washington, supra,* 390 U.S. at 334, 88 S.Ct. at 995 (concurring opinion of Black, Harlan and Stewart, JJ.). This exception, however, is a narrow one, *Mickens, supra,* 462 F.Supp. at 911, and does nothing more than recognize the general principle that prison officials have discretion in extreme situations to take whatever action is necessary to maintain discipline and security within their institutions, even if such action infringes on the constitutional rights of inmates. *Wyandotte County, supra.* There is no evidence in this case that the practice at CCF arose out of any extreme or exigent circumstance involving racial conflict. Indeed, it does not appear that there could be any such evidence since blacks and whites have not been integrated in prison reception housing for at least ten years. A vague

fear on the part of prison officials that segregation may result in violence is simply not enough to justify suspension of the fundamental constitutional right here at issue. *Id.; McClelland v. Sigler,* 327 F.Supp. 829 (D.Neb.1971), *aff'd,* 456 F.2d 1266 (8th Cir. 1972) (per curiam). The Supreme Court has stated this principle as follows:

It is urged that this proposed segregation will promote the public peace by preventing race conflicts. Desirable as this is, and important as is the preservation of the public peace, this aim cannot be accomplished by laws or ordinances which deny rights created or protected by the Federal Constitution.

*Buchanan v. Warley,* 245 U.S. 60, 81, 38 S.Ct. 16, 20, 62 L.Ed. 149 (1917); *Accord, Cooper v. Aaron,* 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958).

■ Despite the prohibition of segregation in prison as well as non-prison settings, defendants contend that this matter should be left to their discretion as prison administrators. They claim that the facts: that CCF is a reception center, that it is integrated in some areas, that only cells—not blocks—are segregated,[4] and that the segregation is only temporary, all somehow serve to insulate their action from constitutional scrutiny. This is erroneous. The mandate of the Fourteenth Amendment is clear. As the Court has already indicated, judicial deference to administrative discretion is not unbounded. The Supreme Court has plainly stated:

[A] policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights.

*Procunier v. Martinez,* 416 U.S. 396, 405–06, 94 S.Ct. 1800, 1807–08, 40 L.Ed.2d 224 (1974).

---

**4.** It is clear that segregation by cell is no more permissible than segregation on a broader basis, for example by block. *See, e. g., Thomas v. Pate,* 493 F.2d 151, 154 (7th Cir. 1974); vacated

and remanded on other grounds *sub. nom. Cannon v. Thomas,* 419 U.S. 813, 95 S.Ct. 288, 42 L.Ed.2d 39 (1974); *see, Thomas v. Pate,* 516 F.2d 889 (7th Cir. 1975) (opinion on remand).

Accordingly, the Court finds that the practice of segregating prisoners by race at CCF has not been justified by the defendants in this case, and the further practice of such segregation will, in accordance with the order stated below, be enjoined.

### III. Use of Restraints

As with the practice of racial segregation, defendants do not dispute that various types of body restraints are used on prisoners at CCF. The particular practice at issue before the Court is the use of so-called "four-way restraints," in which the prisoner is chained on his back to a metal bed frame by means of handcuffs and leg irons. Additionally a "belly chain" is often used to secure the prisoner's middle to the frame. The position in which the prisoner is placed varies, so that a prisoner is sometimes spread-eagled with each arm and leg secured to a corner of the frame; other times his hands are cuffed to the bed at his side rather than over his head, or his legs are shackled together. The devices used are generally "hard restraints," i. e., metal chains and handcuffs, although "soft restraints" made of leather are sometimes used.

The parties have stipulated to several matters regarding the use of four-way restraints at CCF as follows: the restraints are applied in one-man disciplinary control cells or in a single-occupancy cell of the prison infirmary. Such restraints may be ordered by the custody deputy or a shift captain and "ordinarily" the officer who initially orders restraints on is the person responsible for ordering them off again. Inmates are restrained in four-way restraints at CCF for several reasons, including the following: causing disturbances, assaulting a guard, flooding a cell, attempting escape, attempting suicide and setting fires.

The plaintiffs claim that the use of four-way restraints at CCF amounts to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution. In support of this claim plaintiffs produced at the hearing three inmates who had previously been placed in four-ways at CCF. This testimony is discussed below. The Court also heard the expert testimony of Dr. David Fogel, a professor of criminal justice at the University of Illinois and consultant on corrections practices, and Dr. Frank L. Rundle, a psychiatrist experienced in corrections work. Both of these experts had inspected the Columbus facility and interviewed personnel working there.

The first inmate witness called by plaintiffs was Michael Patterson, a former resident of CCF, now housed at the Southern Ohio Correctional Facility in Lucasville. Patterson testified that he was placed in restraints after fighting with a' guard. After the fight, Patterson testified, he was taken to a disciplinary isolation cell where he was stripped, given a set of blue coveralls, and chained to the bed. The testimony and photographic exhibits at the hearing depicted the cell as bare except for the bed, which was embedded in concrete, a sink, and a rudimentary toilet which was essentially a hole in a block of concrete. The other inmates who testified were restrained in similar cells.

Patterson testified that on his first day in restraints he was released for approximately one hour so that he could. be questioned by the Ohio Highway Patrol. After that he was returned to his cell and again chained to the bed. The bed was bare except for a thin foam mattress. He was given no covers. The prisoner stated that he was neither allowed to use the toilet or to eat during the entire day. Food was placed under the door to his cell on a tray; however, he was not released from his restraints to eat it. He was forced to lie in his own body waste and was given no change of clothing the first day. This treatment continued, Patterson testified, until suppertime on the second day when he was finally allowed up for 15 minutes to use the toilet. He was also allowed to eat his meal, but not until after he had been rechained to the bed.

For the next three days Patterson was released for 15 minutes at meal time to eat and use the toilet, and then was again restrained on the bed. On the fifth day, after

being chained to his bed for all but several 15-minute periods over the entire five days, Patterson was released.

A second inmate, Darick Adams, related a five-day ordeal in restraints similar to that of Patterson. Adams testified that after a scuffle with guards he was taken to a correctional cell and put into restraints. He testified his wrists were cuffed to his sides in such a way that he was unable to lie flat on his back; as a consequence he was forced to spend the night propped on his elbows. The next morning, Adams stated, he was moved to another cell where he was chained in the "standard" spread-eagle fashion for the next four days. On the first full day he was not released to eat or to use the toilet. A food tray was placed under his cell door at meal times, but he was not released to eat it. Even though this incident took place in January, Adams spent the first night without bed covers. On the second day he was given a sheet. Also on the second day Adams was released on his side on the bed with one arm temporarily released from restraints. Similarly for the remaining days he was permitted up to use the toilet once or twice, but for the remaining time, including meals, he was chained to his bed. After five days of this treatment Adams was released from restraints.

Finally, a third inmate, James W. Bolden, testified that during his stay at CCF he had been placed in four-way restraints on several different occasions, totalling approximately 27 days. Bolden's testimony is corroborative of that of inmates Patterson and Adams regarding the practices used at CCF for restraining prisoners. On several occasions he was denied the use of the toilet and had to lie in his own waste. For the most part he was forced to eat in restraints, with only one arm released, and at times, when his only option was to be spoon-fed, Bolden refused to eat at all.

Defendants called as a witness Roger Hammond, a CCF guard who works in the disciplinary control block where four-way restraints are applied. Hammond denied that prisoners were ever not released to eat food placed in their cells, or that prisoners were refused the use of the toilet. He did acknowledge that prisoners sometimes urinated on themselves and had been observed lying in their own waste in restraints.

Dr. Fogel testified that he was informed that prisoners placed in four-way restraints generally spend an average of three to four days in restraints. This was corroborated by the testimony of Mr. Hammond. Fogel stated that the longest period spent in restraints, as related to him, was 15 days.[5] It appears both from Fogel's testimony and that of the inmates, that there have not been promulgated any official guidelines or instructions governing the use of restraints, and Superintendent McKeen acknowledged that prior to the hearing there were no such guidelines in effect.[6]

McKeen also testified that the official responsible for placing an inmate in restraints is the custody deputy or shift captain on duty at the time of an incident. This same corrections officer is also generally the one to determine whether the inmate should be released or continued in restraints. It appears that this determination is virtually insulated from review. No machinery exists by which the custodial officer's decision is routinely reviewed, either by McKeen, an oversight authority, or by medical or psychiatric personnel.

Cross-examination of the inmates who testified at the hearing revealed that they were considerably less than model prisoners. Inmate Patterson, for instance, had inflicted upon a guard a razor wound which required 40 stitches. Darick Adams is apparently a source of continuous discipline problems, and James Bolden is an incorrigible

---

**5.** Defendants deny that a prisoner was ever kept in restraints for 15 days; however, given the Court's resolution of this matter, the point is moot.

**6.** On the day of the hearing defendants filed with the Court proposed guidelines governing the use of restraints. There is no indication that the superintendent knew of the guidelines or that they had ever been used. Therefore, the Court will not consider their acceptability at this time.

trouble-maker who has assaulted guards, flooded his cell, and attempted suicide. The testimony of these men presents the Court with weighty credibility problems. Yet even discounting such testimony substantially, the Court finds that evidence introduced by defendants in part confirms enough of the inmates' account of their treatment to move the Court to enter this order concerning the use of restraints. Defendants acknowledge, and I find, that inmates have been placed in four-way restraints for periods ranging between two and seven days in locked disciplinary control cells. They have been restrained generally without benefit of medical advice or control and at the discretion of corrections officers working without written guidelines.

The case of inmate Bolden revealed another potentially serious consequence of the practices at CCF. It appears from the prison's own medical records on this inmate, as well as his testimony, that Bolden is epileptic. Yet on several occasions, and without medical advice, he was placed in four-way restraints. On one of these occasions, Bolden testified, he suffered a seizure, yet afterwards did not receive any medical attention. Superintendent McKeen testified on the other hand that Bolden did receive medical attention from a prison-employed extern (medical student) after suffering the seizure. Regardless whether Bolden received treatment following his seizure, the Court is of the opinion that a procedure which allows an epileptic inmate to be placed in a four-way restraints without medical supervision is seriously flawed. Dr. Rundle testified that such an occurrence, with the obvious danger that the epileptic inmate could vomit and suffocate, is life-threatening. Clearly this incident evidences an insensitivity to a legitimate potential for human distress which should not continue.

█ Both Dr. Fogel and Dr. Rundle vigorously condemned these practices. It was clear to them, as it is to the Court after hearing all the evidence, that restraints are on occasion used as a punitive, not a control measure.[7] Further, both Drs. Fogel and Rundle testified regarding the invidious long-term effects arising out of the use of restraints on a prisoner. Their testimony was similar in making the point that such treatment can only develop a state of sustained resentment and anger, and a brooding sense of injustice which is destructive to the man, the prison environment, and eventually to society. As Dr. Fogel stated, there is very little in these practices that will teach a man respect for the law. Upon a review of the evidence, the Court regretfully agrees. *See, Jackson v. Bishop*, 404 F.2d 571 (8th Cir. 1968).[8] This treatment, which the Court finds has often been meted out as punishment, not for control, is clearly outside of the bounds of the Eighth Amendment.

The Eighth Amendment to the United States Constitution provides:

> Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

This amendment has not been regarded as a static concept, and as has often been stated, "[t]he Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). "A penalty

---

7. In one instance, for example, an inmate was placed in four-ways for throwing a urine-soaked rag and spitting at a guard. Superintendent McKeen classified this at the hearing as an instance of "acting out" in which the inmate "needed to be placed in a position of greater control."

8. Although *Jackson v. Bishop* concerned the practice of flogging with a leather strap, the Court considers certain reasoning of the *Jackson* court to be applicable here where restraints are used as a means of corporal punishment. In particular at p. 580 then-Judge Blackmun stated:

> Corporal punishment generates hate toward the keepers who punish and toward the system which permits it. It is degrading to the punisher and to the punished alike. It frustrates correctional and rehabilitative goals. This record cries out with testimony to this effect from the expert penologists, from the inmates and from their keepers.

also must accord with 'the dignity of man,' which is the 'basic concept underlying the Eighth Amendment.'" *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976) (quoting *Trop, supra*, 356 U.S. at 100, 78 S.Ct. 590). In light of these precepts, the Supreme Court has "steadfastly maintained that a penalty is unconstitutional whenever it is unnecessarily harsh or cruel." *Furman v. Georgia*, 408 U.S. 238, 332, 92 S.Ct. 2726, 2774, 33 L.Ed.2d 346 (1972) (Marshall, J., concurring).

Given even this elementary outline of the requirements of the Eighth Amendment, the Court cannot avoid a finding that the practice of restraining prisoners by chaining them on their backs to beds for days at a time, on occasion without timely access to toilet facilities, does not comport with the standards of decency of a civilized society. Certainly the practice of restraining human beings in this manner amounts to cruel and unusual punishment. *See, Owens-El v. Robinson*, 442 F.Supp. 1368, 1381 (W.D.Pa. 1978); *Landman v. Royster*, 333 F.Supp. 621, 647 (E.D.Va.1971).

The Court realizes that in some extreme circumstances there may be good reason to temporarily restrain an inmate, as for instance when the inmate threatens suicide or experiences a violent episode of mental instability, or needs to be completely subdued for a very short period of time after behaving violently toward another person. But the use of restraints as punishment for "acting out" or misbehaving is simply too extreme a response. Defendants maintained at the hearing that the use of restraints is the most humane method of controlling prisoner behavior. The Court is simply unable to believe that there is not a more moderate and constitutionally acceptable method of maintaining discipline and order.

In the situations where restraints are necessary, however, the inmate should receive immediate medical attention and care. Any use of restraints beyond the time required to receive this attention should be under the control of medical personnel. Other than the situations noted above, the Court is unable to conceive of, nor does the evidence indicate, any other situations which would require the use of four-way restraints.[9] Behavior which has in the past apparently been punished by the use of restraints could be controlled, for example, by isolating such prisoners in cells where they would not be able to assault other persons or commit acts of destruction.

The Court is acutely aware of the difficult task facing prison administrators who must deal daily with recalcitrant, unruly and often dangerous inmates. The Court must accord these administrators wide discretion within which to deal with these persons and maintain discipline and security, *Bell v. Wolfish, supra*. Nevertheless, this discretion cannot extend to the infliction of cruel and unusual punishment of the type discussed herein. The Court is confident that once the use of restraints is no longer available as a convenient *punishment* measure, prison administrators will be well-capable of finding less drastic means of controlling unruly inmate behavior.

## IV. Order

As stated, this matter is presently before the Court on plaintiffs' motion for preliminary injunction. In order for the Court to grant such relief it must make the following determinations:

(1) whether plaintiff has shown a strong or substantial likelihood or probability of success on the merits;

(2) whether plaintiff has shown irreparable injury;

(3) whether the issuance of a preliminary injunction would cause substantial harm to others;

(4) whether the public interest would be served by issuing a preliminary injunction.

*Mason County Medical Ass'n. v. Knebel*, 563 F.2d 256, 261 (6th Cir. 1977).

---

**9.** Of course the Court is referring to the use of restraints within the prison setting. I recognize that certain situations, as for example transporting prisoners in the prison, between prisons, or to the hospital or court may require stricter measures of restraint and control.

Upon consideration of the facts of this case it is eminently clear that injunctive relief is warranted under the above criteria. The Court finds that there is a substantial likelihood that plaintiffs will succeed on the merits of their claim, and that plaintiffs have shown clear violations of constitutional rights amounting to irreparable harm. Further, having considered and rejected defendants' claims that the challenged measures are necessary for institutional security, the Court cannot find that injunctive relief would cause substantial harm to others. Finally, it cannot be doubted that the cessation of these practices will well serve the public interest. Accordingly, plaintiffs' motion for preliminary injunction will be GRANTED. Defendants are hereby ordered as follows:

### 1. Segregation

Within ten (10) days from the date of this order defendants will cease the practice of assigning reception inmates to cells on the basis of race. Thereafter, no inmate arriving at CCF is to be assigned to a cell on the basis of race unless the superintendent of the institution personally finds it to be necessary and prepares a specific statement in writing and with supporting reasons stating that the inmate in question should not be confined in an integrated cell; such finding is to be made a part of the inmate's prison record.[10]

### 2. Restraints

Defendants will cease using four-way restraints as a means of punishment.

Defendants will, within ten (10) days of the date of this order, submit to the Court, with a copy to the plaintiffs, proposed guidelines for the use, for control, of four-way restraints at CCF. Thereafter, plaintiffs will have seven (7) days to respond to the proposed guidelines. The Court will then rule on the guidelines, either approving their implementation as submitted or with modifications. The following guidelines will serve as minimum interim standards governing the use of restraints at CCF.

(a) Four-way restraints (or other types of restraints which, when applied, prevent a prisoner from rising from his bed, using toilet facilities, or eating) will not be used on any inmate in a locked cell except in extreme circumstances such as those set forth on p. 1193 *supra.*

(b) In such circumstances only, restraints may be applied for a period not longer than three (3) hours on the order of a shift supervisor. Any *continued* use of restraints must be approved by a physician, either personally or by telephone, within the three-hour period. This extension may be for no longer than eight (8) hours. Authorization for continued use of restraints beyond an initial extension can be given only by a physician based on a personal examination of the inmate and only for reasonable periods not to exceed eight (8) hours. The inmate may not be continued in restraints beyond the authorized period without a further personal examination and authorization by a physician.

(c) The inmate should be released or placed in lesser restraints unless the physician finds that his behavior mandates otherwise.

(d) A log shall be kept noting the name of the inmate restrained, the reason for the restraint, the type of restraint used, the time of initial restraint, the time of authorization and the name of the physician, the time of each re-authorization and the name of the physician, and the time of release. *See Owens-El v. Robinson,* 457 F.Supp. 984, 990 (W.D.Pa.1978) (final order modifying *Owens-El v. Robinson, supra,* 442 F.Supp. 1368; *Campbell v. McGruder,* 416 F.Supp. 100, 106 (D.D.C.1975).

It is so ORDERED.

---

**10.** The Court does not by this order mandate that every cell must be integrated, *i. e.,* contain a white and a non-white inmate. The order simply requires that race not be used as a factor in assigning prisoners to cells.