Jerome L. WILLIAMS, Plaintiff–
Appellant,

v.

Peter VIDOR and Willie Ray,
Defendants–Appellees.

No. 92–2386.

United States Court of Appeals,
Sixth Circuit.

Submitted Dec. 10, 1993.

Decided Feb. 23, 1994.

Jerome L. Williams, pro se.

Deborah K. Isom, Asst. Atty. Gen., Luann Cheyne Frost, Peggy L. Miller (Briefed), Office of the Atty. Gen., Corrections Div., Lansing, MI, for defendants-appellees.

" Before JONES, Circuit Judge; BROWN, Senior Circuit Judge; and WEBER, District Judge.*

PER CURIAM.

Plaintiff Jerome L. Williams, a prisoner in Michigan, brought this pro se action under 42 U.S.C. § 1983 against the deputy warden, Peter Vidor, and against Willie Ray, a sergeant, of the state institution in which plaintiff was a prisoner. Defendants filed a motion for summary judgment supported by affidavits, and plaintiff also filed a motion for summary judgment so supported. The district court granted the motions of the defendants and denied the motion of plaintiff.[1] Plaintiff appealed, and we affirm the district court's grant of summary judgment to Sergeant Ray and its denial of plaintiff's motion as to Ray. We reverse the district court's grant of summary judgment to Deputy Warden Vidor but affirm its denial of summary judgment to plaintiff with respect to defendant Vidor. The result is that we remand plaintiff's action against defendant Vidor to the district court for further proceedings.[2]

I

In reviewing the grant of summary judgment to Sergeant Ray, we consider the facts in a light most favorable to plaintiff, but in reviewing the denial of summary judgment to plaintiff as to his claim against Sergeant Ray, we consider the facts in a light most favorable to Sergeant Ray. In reviewing the grant of summary judgment to Deputy Warden Vidor, we consider the facts in a light most favorable to plaintiff and in reviewing the denial of summary judgment to plaintiff, we consider the facts in a light most favorable to Vidor.

II

In stating the operative facts presented by the cross-motions for summary judgment, we set forth those that are not in dispute in the affidavits making up the summary judgment record.

Williams was imprisoned at the Ionia Maximum Correctional Facility ("IMCF"). Defendant Vidor was deputy warden of the IMCF; Sergeant Ray was employed there. On Friday morning, March 25, 1988, Williams was transferred to a housing unit at the IMCF. In response to the staff's withholding of his stereo headphone set, Williams became angry, repeatedly shook or kicked the door to his cell and loudly complained, causing other prisoners to become restive, and he threw a trash can, damaging and requiring replacement of the cell's toilet.

Guards then took Williams from his cell and placed him in top-of-bed ("TOB") restraints, that is, plaintiff was fully restrained by chains and shackled to his bed (but allowed to smoke and go to the toilet from time to time), where he remained for some 72 hours until he was released on Monday, March 28. Deputy Warden Vidor authorized the TOB restraint, and Sergeant Ray placed Williams in the restraint. During this period of restraint, Williams particularly complained of pain in his abdomen, where he had an exposed "stitch" resulting from an old stab wound and colostomy closure. The prison's nurses and other employees checked him

---

* The Honorable Herman J. Weber, United States District Judge for the Southern District of Ohio, sitting by designation.

1. When the court initially granted defendants' motion, it did not realize that plaintiff had filed a motion for summary judgment that was supported by affidavit. After recognizing that it had overlooked plaintiff's affidavit, it then, nevertheless, again held that defendants were entitled to summary judgment.

2. " 'The fact that [both plaintiff and defendants] have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts.' " *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir.1991) quoting *Mingus Constructors, Inc. v. U.S.*, 812 F.2d 1387, 1391 (Fed.Cir.1987).

from time to time and supplied him with Tylenol although he requested a stronger pain killer. On Saturday, March 26, a nurse wrapped a pillow case around the belly chain after Williams complained it was irritating his colostomy stitch. Authority to hold Williams TOB more than 24 hours (effectively over the weekend) was granted by an Assistant Deputy Director and Vidor approved his release and return to a cell on Monday, March 28. Williams was not violent while he was TOB but did complain bitterly about his condition.

Williams brought suit under § 1983 claiming that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment;[3] that he was treated differently from other prisoners based on his race and was thus denied equal protection of the law under the Fourteenth Amendment;[4] that the defendants deliberately ignored his need for medical care;[5] and that his Fourteenth Amendment due process and liberty interest rights were violated by the TOB restraint.

## III

■ With respect to Sergeant Ray, we have no problem with approving the grant of summary judgment to him because the record shows without dispute that he did not make the decision to place Williams in the TOB regime, did not make the decision to keep Williams there for any particular period of time and that he did carry out his duty, personally or by guards under his direction, to check on Williams from time to time.

## IV

■ As to Deputy Warden Vidor, the picture is more complicated with respect to the "cruel and unusual punishment" claim. The main thrust of plaintiff's claim here is that Vidor is responsible for Williams' being kept TOB for 72 hours. It is true, of course, that,

as heretofore stated, Vidor approved his initially being placed TOB on Friday and approved his release from TOB on the following Monday, but, according to Vidor's affidavit, the decision to continue Williams' TOB status over the weekend was made by an Assistant Deputy Director, not Vidor. Accordingly, we could not hold that Williams is entitled to summary judgment against Vidor on the theory that, as a matter of law, it was cruel and unusual punishment to maintain Williams TOB for 72 hours. On the other hand, we cannot approve the grant of summary judgment to Vidor on this issue because we should not assume at this point that Vidor did not actually approve Williams' being held TOB for 72 hours. This is true because Williams, proceeding pro se, was denied discovery, on motion of defendants, by a magistrate judge pending disposition of defendants' motion for summary judgment. It is without dispute, of course, that Vidor ordered Williams to be placed on TOB for about 24 hours, but applying the standards of *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) ("unnecessary and wanton infliction of pain"), and *Hudson v. McMillian*, —— U.S. ——, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (whether the TOB restraint was objectively harmful enough and Vidor acted with a sufficiently culpable state of mind), we cannot say that, *as a matter of law*, such conduct of Vidor violated that standard.

## V

Williams also contends that his being placed in TOB status, under the circumstances, was in violation of various state laws, rules and regulations and, as such, constituted a violation of a liberty interest under the Fourteenth Amendment. The district court denied relief under this theory.

Because this issue was not developed in the district court (Williams being pro se), it

---

3. "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." *U.S. Const.* amend. VIII.

4. There is nothing in the record to support the contention that Williams was treated differently because of his race and therefore we approve summary judgment on that issue.

5. We treat plaintiff's claim that defendants deliberately ignored his need for medical care as an aspect of his "cruel and unusual punishment" claim. In any event, in view of the care Williams received, by nurses and others, we cannot say that lack of such care, as shown by the summary judgment record, constituted cruel and unusual punishment as a matter of law.

should, if Williams continues to pursue it, be presented upon remand. *See, e.g., Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989).

## VI

Vidor also relies on qualified immunity as a separate defense. The district court did not deal with this question, because, in granting summary judgment to defendants on the ground that there was no constitutional violation, it was unnecessary to do so. Accordingly, we need not dispose of this issue.

## VII

It results that the dismissal of plaintiff's claim against defendant Ray is **AFFIRMED**; the dismissal of his claim against defendant Vidor is **REVERSED**, and the cause is **REMANDED** for further proceedings.

The district court will promptly appoint counsel for plaintiff.

NATHANIEL R. JONES, Circuit Judge, concurring in part and dissenting in part.

Although I concur in the rest of the majority opinion, I respectfully dissent from section III.

## I

While I do not disagree with the statement of facts provided by the majority, there are additional facts that need to be highlighted. They are set forth herein.

First of all, a key disputed fact is not cited. Williams maintains that, at approximately 11 a.m. on March 25, 1988, moments before William's was escorted from his cell and placed in TOB restraints, Ray said to Williams, "You got it coming. You're in restraints for days." J.A. at 9 (Complaint); Plaintiff's Affidavit at ¶ 5. Ray maintains that he said no such thing. Ray Affidavit at ¶ 8.

Both parties agree, however, that Williams damaged his toilet at 10:35 a.m. on March 25. At 11:05, Williams was escorted to another cell in order to be physically restrained, and pursuant to Vidor's orders, Williams was placed in top of bed (TOB) restraints at

11:17. Significantly, Defendants do not dispute that, once the toilet was damaged, Williams became entirely cooperative, displaying no violent, belligerent, or anti-social behavior after that time. Not only do Defendants not contend otherwise, but Ray, in his affidavit, expressly declares that Williams was placed in TOB restraints "without incident." Ray Affidavit at ¶ 6. The unit log book also confirms that Williams "went voluntarily no force." Unit 3 Log Book (2/10/88—4/27/88).

Ray also admits that Williams was restrained "for destroying/breaking his toilet," and does not contend that the restraints were applied in order to prevent any anticipated further violence. Ray Affidavit at ¶ 8. Vidor, in his affidavit, also declares that "Williams was placed in TOB restraints because he damaged cell property," but Vidor notes that the restraint also served to prevent possible further damage to cell property. Vidor Affidavit at ¶ 25. Significantly, however, Vidor does not state any reason for believing that such further damage was anticipated in Williams's case; rather he merely attests in general terms that but for TOB restraints, "prisoners could destroy cells continuously," *Id.* at ¶ 7, and that but for restraints Williams "would still have enough mobility to damage his cell if he *choose* [sic] to do so." *Id.* at ¶ 27 (emphasis added). Vidor acknowledges that approximately a half hour passed, without any further display of violence by Williams, between the time that Williams damaged his toilet and the time that he was escorted from his cell. *Id.* at ¶¶ 5, 7.

It is helpful to review in some detail the 72 hours that Williams spent shackled to a bed, in order to indicate just how little attention Williams actually received. A nurse checked on Williams shortly after he was placed in TOB. Williams complained of pain, but did not want to take Tylenol. At that time, a note was entered into the unit log stating that "Williams is on 15 minute watch because of TOB restraints." Unit Log Book, *supra.* This requirement of a 15 minute check is in accordance with Michigan Department of Corrections Policy Directive PD–BCF–32.02, page 4, subpart (d), (quoted *infra*), which was

in effect at the time. This directive also requires that each 15 minute check *must be documented.* For the next 20 hours, however, there is no indication that anyone checked on Williams every 15 minutes. To the contrary, subsequent notations in the log pertaining to Williams occur only hours apart. In light of the fact that, as of the following morning, the log does show that Williams was checked every 15 minutes, and in light of the fact that the relevant policy directive mandates documentation of each 15 minute check, it is fair to assume that Williams was not checked except at the times specifically noted in the log.

At 2:45 p.m., Williams was offered a bathroom break. Half an hour later, nurses checked on Williams, offered him another bathroom break, and ascertained that his circulation was fine. Four hours later, his restraints were checked again. Two and a half hours later, at 9:20 p.m., he enjoyed another bathroom break. His restraints were checked again at 12:30 a.m., March 26th, and he was offered water and the use of the bathroom at 2:50 a.m.

At 4 a.m., Williams complained that the stomach chain was irritating his colostomy stitches. A nurse placed a pillow between the stitches and the chain. Between 6:40 a.m. and 2 p.m., Williams was checked every 15 minutes. He was offered water and use of the restroom regularly, and he was fed twice. He complained of pain at 12:20 p.m. The nurse offered him Tylenol, but he wanted something stronger.

After the 6 to 2 shift left, Williams was no longer checked every 15 minutes. The next log entry was at 3:10 p.m., when Williams was again offered use of the bathroom. Williams enjoyed no further interaction for the next four hours. At 7:45 p.m., and again at 9:20 p.m., he was checked and was offered bathroom breaks. At 12:20 a.m., on March 27, he was checked again. At 2:50 a.m., he was offered another bathroom break, and at 5:45, he was checked again.

Like the previous day, Williams was checked every 15 minutes by the 6 to 2 shift. He was offered water and use of the bathroom regularly, was given a cigarette, and was fed. After the shift changed, Williams was not checked again until 3:20 p.m. Williams was allowed to smoke a cigarette at 5:30 p.m. and was given water at 7:30 p.m.

There was no interaction for the next six hours. The next time Williams was checked was 1:30 a.m. on March 28. He was not checked again until four hours later. The 6 to 2 shift again checked on Williams regularly, but there is no indication that they fed him. Defendant Vidor instructed that Williams be taken off of TOB at 11:22 a.m., Monday, March 28. According to Defendants, in the 72 hours that Williams had been chained to the bed, he was checked only eight times by nurses. Defendant's Brief at 6.

Vidor declared in his affidavit that Williams was finally removed from TOB restraints because he was no longer hostile. Vidor does not contend, however, that Williams had ever been hostile between the time he was escorted from his cell three days earlier, and the time he was finally released from the restraints. During this period, it is uncontroverted that Williams displayed no violent, belligerent, or anti-social behavior whatsoever.

Williams's affidavit indicates, among other things, that he pleaded with a guard and a nurse to be allowed out of the restraints, and that they replied that they could not remove him because it was a weekend. Similarly, Vidor admits in his affidavit that he did not review Williams's situation between Friday, March 25, and Monday, March 28.

When the district court granted Defendant's summary judgment motion, it found that Williams demonstrated a "threat of continued destructive behavior," and expressly gave full credence to Defendants' version of the facts, even while acknowledging that Plaintiff offered a different version of them, and that the court must construe contested facts in Plaintiff's favor. J.A. at 20–21, 24. Oddly, even though Williams's affidavit was properly attached to his motion for summary judgment, the court failed to take notice of it, and erroneously held that "Plaintiff has not responded to defendants' motion with affidavits . . . ." *Id.* at 22.

Next, the district court held that the use of the TOB restraints for three days was reasonable as a matter of law. *Id.* at 24. The court concluded, solely from the note in the log at the *beginning* of Williams's 72 hours in TOB restraints, that Williams was checked every 15 minutes for the full three days, ignoring the fact that the rest of the log book clearly indicates otherwise. *Id.* at 26. Defendants do not assert in their affidavits that Williams was checked this often. Similarly, the district court found that Williams was offered a bathroom break every two hours, but the log shows otherwise, and the record is utterly devoid of any evidence to support the court's finding. *Id.*

II

The reason that I must dissent from Section III of the majority decision is that genuine issues of material fact remain with regard to Defendant Ray. The majority states that "the record shows without dispute that [Ray]

did not make the decision to place Williams in the TOB regime, did not make the decision to keep Williams there for any particular period of time and that he did carry out his duty, personally or by guards under his direction, to check on Williams from time to time." Op. at 859, *supra.* The record does not support this statement. To the contrary, it indicates vast disagreement regarding whether Ray actually carried out his duties toward Williams.

First, according to Williams's version of the facts, as early as 11:00 a.m. Friday, Ray declared that Williams would spend "days" in restraints. If this were true, it would indicate a flagrant disregard of several provisions of Policy Directive PD–BCF–32.02 (effective 9/85 to 10/88), issued by the Michigan Department of Corrections.[1] In particular, the directive provides that any continued restraint beyond 2 hours must be approved by the warden or his deputy, and staff, (which of course includes Ray), is responsible for re-

---

1. The express objective of this policy directive is:

To assure that prisoners who are suicidal, destructive, violent, or who display signs of imminent violence, are properly controlled through methods most appropriate to their condition and are subject to no more than the amount of force and physical restraint necessary to ensure the safety of the prisoner him/herself, of staff and other prisoners, and/or to protect state property.

The directive provides, in pertinent part:

When it is necessary to overpower and restrain a prisoner who constitutes a danger to self or others, or who is destroying state property, only that amount of force which is necessary to gain control over the person is permitted. Such actions may never be capricious, retaliatory or punitive under any circumstances.

\* \* \* \* \* \*

When there is the opportunity to plan strategy in advance when dealing with prisoners who are suicidal, destructive, violent, or who display signs of imminently becoming violent, the shift commander or assistant shift commander must be in charge and at the scene. Sufficient staff will be mustered because a show of superior strength and preparedness will often convince the prisoner that resistance is futile. If possible, the supervisor at the scene must listen to the prisoner's side of the issue, explain to the prisoner what must be done, and outline the alternatives which the prisoner faces.

\* \* \* \* \* \*

Upon gaining physical control over the prisoner, initial consideration shall be given for plac-

ing him/her into a "stripped" cell or room, quiet room, suicide observation room or psychiatric seclusion room, as appropriate. However, if these modified cells or rooms prove to be inadequate to control the prisoner's behavior, physical restraints may be applied, subject to the following safeguards:

(a) Soft (leather) restraints must be used if feasible. Hard restraints (metal handcuffs, belly chains and leg irons) shall only be applied if soft restraints have proven ineffective. . . .

(d) Restrained prisoners must be offered the opportunity to use toilet facilities and shall have access to fresh drinking water every two hours when awake. They shall be fed by staff at mealtime if it is not considered safe to remove the restraints for self-feeding. They must be visually checked by staff every 15 minutes which is to be documented on the door card.

(e) Use of restraints beyond an 8–hour period requires the supervision of medical personnel. They shall visit the prisoner at least twice during each shift. . . .

(f) Restraint equipment may not be used to secure a prisoner to a stationary object. However, in some instances, it may be necessary to restrain the prisoner on top of a bed. In such cases, his/her arms will be positioned by the prisoner's side, not above his/her head. Staff must also periodically rotate the prisoner's position to prevent soreness or stiffness.

(g) Staff is responsible for removing the restraints as soon as the need for them no longer exists. . . .

moving the restraints as soon as the need for them no longer exists. Thus, it is not surprising that Ray denies this allegation. What is surprising, however, is that neither the trial court nor the panel majority regards this as a dispute of material fact.

Second, even without the benefit of counsel, Williams managed to allege both in his affidavit to the court below, and in his brief on appeal, that Ray failed to comply with several other aspects of this policy directive. The directive requires that an inmate in restraints must be checked every 15 minutes. The log book indicates that this was not done. The directive also requires that a restrained inmate must have the opportunity to receive drinking water and to take a bathroom break every two hours. This, too, did not occur. Finally, as mentioned above, the directive mandates that "staff" must remove TOB restraints as soon as the restrained inmate's behavior permits. Construing the facts in Williams's favor, as we must in this summary judgment posture, Ray may have borne the responsibility for complying with this mandate in Vidor's absence. Especially in light of the fact that Williams has not yet had the benefit of legal representation in this matter, it is grossly unfair to not allow Williams, upon remand, to argue that Ray's failure to execute his duties resulted in the violation of Williams's Eighth Amendment and due process rights.

### III

Although I join in sections IV through VI of the majority opinion, I wish to address some issues that are relevant to these sections that are unaddressed in the majority opinion.

The Eighth Amendment prohibits both "barbarous physical punishments," and "punishments which, although not physically barbarous, involve the unnecessary and wanton infliction of pain." *Rhodes v. Chapman,* 452 U.S. 337, 345–46, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981).

In *Stewart v. Rhodes,* 473 F.Supp. 1185, 1193 (S.D.Ohio 1979), *aff'd without op.,* 785 F.2d 310 (6th Cir.1986), the court held, and the Sixth Circuit affirmed that, although

TOB restraints may be necessary to *control* a violent inmate, it is a violation of the Eighth Amendment to use them to *punish* an inmate. The court stressed that the constitutional use of such restraints was limited to instances "when the inmate threatens suicide or experiences a violent episode of mental instability, or needs to be completely subdued for a very short period of time after behaving violently toward another person." *Id.*

In the present case, the uncontroverted evidence is that Williams was completely docile at the time he was restrained, and thereafter for the full three days he remained in TOB restraints. He displayed no violence toward anyone, and the only violence he displayed prior to being restrained, (which was merely directed at a toilet), had since subsided. Under *Stewart,* the use of TOB restraints under these circumstances violated Williams's Eighth Amendment rights.

The district court attempted to distinguish *Stewart* on its facts. It pointed out that in *Stewart,* the plaintiffs were not allowed to use toilets and were not fed while they were restrained. However, the district court in the present case failed to notice that most of the propositions of law set forth in *Stewart* did not turn on these particular facts, but applied to the use of TOB restraints in general.

In my view, the only reason that Plaintiff is not entitled to summary judgment on this issue is that there remains a genuine issue of material fact as to the extent to which Vidor and Ray, together with other corrections officers, share the responsibility for violating Williams's rights.

### IV

I agree with the majority that the factual record as regards Williams's due process claim was not well developed in the court below, and that remand is therefore appropriate. In particular, it is not clear to what extent Vidor and Ray are themselves liable for violating Williams's due process rights. Nevertheless, I believe that the relevant law on this subject is clear, and it may be helpful

to the parties and to the court below to review it.

The Fourteenth Amendment prohibits any state from depriving "any person of life, liberty, or property without due process of law," and protects "the individual against arbitrary action of government." *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 459–60, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989); *Meachum v. Fano*, 427 U.S. 215, 223, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976); *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974). Due process claims are to be handled in two steps: first, one asks whether a liberty or property interest exists that has been interfered with by the state; second, one determines whether the procedures attendant upon that deprivation were constitutionally sufficient. *Thompson*, 490 U.S. at 460, 109 S.Ct. at 1908. Liberty interests that are protectible under the due process clause can arise either directly from the Constitution, or indirectly from the laws of the states. *Id.* A state creates a liberty interest by placing substantive limitations on official discretion. *Id.* at 462, 109 S.Ct. at 1909.

The test for determining whether a liberty interest flows directly from the due process clause is whether the interest is "qualitatively different from the punishment characteristically suffered by a person convicted of crime." *Id.* at 460, 109 S.Ct. at 1908. In *Thompson*, for example, the Court held that denial of prison access to a particular prisoner was not protected directly by the due process clause, because such a denial "was well within the terms of confinement ordinarily contemplated by a prison sentence." *Id.* at 461, 109 S.Ct. at 1909.

Applying this reasoning to the present case, TOB restraints are not at all within the terms of confinement ordinarily contemplated by a prison sentence, and they are indeed qualitatively different from characteristic punishments. Thus, the liberty interest of being free from TOB restraints flows directly from the due process clause of the Constitution.

It is also an interest created by Michigan law. *See* Policy Directive PD–BCF–32.02 (quoted *supra*). The language in the directive is obviously mandatory, and it clearly places substantive limits on a prison official's discretion to use TOB restraints. The court below erred to hold otherwise. As per *Thompson*, through this policy directive, the State of Michigan created liberty interests on the part of Williams that are protected by the due process clause.

The next step is to determine what process was due. At minimum, Williams was at least entitled to the protections granted in the policy directive. But it is clear that these protections were not provided to Williams. Williams was restrained far beyond the degree necessary to gain control over him, and far more than was necessary to ensure the safety of persons or property; apparently, the restraints were applied in order to punish Williams for damaging his toilet, rather than to prevent any further anticipated acts of violence; no consideration was given to placing Williams in a modified cell without restraining him, and such placement never "prove[d] to be inadequate to control the prisoner's behavior"; belly chains were applied even though soft restraints would have been effective; Williams was not offered the opportunity to use toilet facilities and obtain drinking water at least every two hours; he was not visually checked every 15 minutes with the check recorded on the appropriate document; medical staff visited him eight times in three days, which is far less often than twice each shift; and Williams's restraints were not removed as soon as his behavior permitted. Therefore, Williams's due process rights were violated. The only question remaining is whether, and to what extent, Vidor and Ray were the ones responsible for these violations, or whether other prison officials shared this responsibility.

## V

State prison officials are entitled to qualified immunity from damage liability under § 1983. *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978). Under the qualified immunity doctrine, Plaintiff is entitled to recover from prison officials only if the officials knew or should have known that they were violating "clearly es-

tablished statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

In the present case, any reasonable prison official knew or should have known that one does not chain to a bed for three full days a docile, cooperative prisoner. They reasonably should have known that they were interfering with a liberty interest created by both the Constitution and Michigan's own policy directive. The Sixth Circuit affirmed *Stewart* in 1986, and so knowledge of *Stewart* is imputed to Defendants. Similarly, the due process doctrine described above has been well-settled for decades. *See, e.g., Meachum*, 427 U.S. at 223–24, 96 S.Ct. at 2537–38; *Wolff*, 418 U.S. at 558, 94 S.Ct. at 2975. It follows that a qualified immunity defense is not available to Defendants in the present case.

## VI

For the foregoing reasons, I would reverse the grant of summary judgment in favor of Ray. I join the court in reversing the grant of summary judgment in favor of Vidor, and in remanding the matter in order to determine the extent to which Vidor and other prison officials share liability for violating Williams's constitutional rights.

I agree with the majority regarding the need for prompt appointment of counsel in this matter. Vidor's affidavit suggests that an unnamed Assistant Deputy Director may share liability with Vidor, or may even be wholly liable, for violating Williams's rights. *See* § IV *infra*. Without expressing any opinion as to whether some facts may be uncovered that could toll the relevant statute of limitations, I note that Michigan has a six year statute of limitations governing this § 1983 action, and that the events underlying this suit took place from March 25–28, 1988. Therefore, the district court should not only act promptly in appointing counsel, but should also expressly caution the appointee that, if Williams wishes to amend his complaint to add other defendants, counsel would be wise to do so before March 25, 1994, so as

to avoid any potential statute of limitations difficulties.