Charles McCLELLAND and Curtis E. Rowland, Petitioners,

v.

Warden Maurice SIGLER, Respondent.

Civ. No. 1666 L.

United States District Court, D. Nebraska.

April 26, 1971.

Richard L. Schmeling, Lincoln, Neb., for plaintiffs.

Harold Mosher, Asst. Atty. Gen., for respondent.

## MEMORANDUM OF DECISION

URBOM, District Judge.

The plaintiffs, Charles McClelland and Curtis E. Rowland, are presently incarcerated in the Nebraska Penal and Correctional Complex. On March 31, 1970, this court granted the plaintiffs' motion to proceed in forma pauperis pursuant to 28 U.S.C.A. § 1915 and ordered the filing of their 86-page hand-written document titled, "Petition to Enforce Civil Rights; to Halt and Prevent Segregation of the Negro's (sic) in the State Prison of Nebraska." Counsel was appointed to represent the plaintiffs and on February 10, 1971, trial was held. No briefs on the merits have been offered.

Throughout these proceedings the plaintiffs' petition has been construed to be a complaint under the Civil Rights Act, 42 U.S.C.A. § 1983, because the attack is directed at conditions concomitant with confinement, rather than an attack upon the validity of a state conviction. The parties have stipulated that three issues exist:

1. Are Negroes systematically excluded from being housed in the East Cell House of the penitentiary unit of the Nebraska Penal and Correctional Complex solely because of their race?

2. Is there a significant difference between the nature and type of facilities in the East Cell House and West Cell House of the penitentiary unit of the Nebraska Penal and Correctional Complex?

3. As a result, are petitioners and other inmates of the penitentiary unit of the Nebraska Penal and Correctional Complex being denied their civil rights as granted to them by the Constitution and statutes of the United States of America under the color of any state law, statute, ordinance, regulation, custom or usage?

From the evidence and the law each of these issues must be answered in the affirmative. The plaintiffs and three other prisoners of the Nebraska Penal and Correctional Complex, sometimes referred to herein as the Penal Complex, testified at the trial about the conditions of the living units, the relationship between white and black prisoners, and the tangible and intangible benefits to be derived from living in one unit as opposed to the other. In response the defendant warden and two other officials of the Penal Complex testified as to the enumerated issues, and provided evidence as to the underlying basis of the present policy of segregation.

## FINDINGS OF FACT

Of all the facilities at the Nebraska Penal and Correctional Complex the only one subjected to an official policy of racial segregation is the general living quarters of the penitentiary unit, consisting of the East Cell House and the West Cell House. In the East Cell House are placed inmates of all racial and ethnic groups except blacks. Members of all racial and ethnic groups are housed in the West Cell House, except those whites who are opposed to living in a cell house with blacks. The protesting whites, estimated at numbering 50, are assigned to the East Cell House.

All temporary living quarters, including the hospital, the maximum security unit, the reception and diagnostic center and the trusty dormitory, are racially integrated. Athletic activities, work assignments, lunchroom facilities, the chapel, and the several self-betterment programs are similarly integrated.

A breakdown of the occupancy of the West Cell House, which contains 234 cells, all one-man cells, shows as of November 20, 1970, the following:

115 Negroes

62 Whites

14 Indians

6 Mexicans

In the East Cell House, consisting of 72 four-man cells and 48 one-man cells, were on the same date:

205 Whites

32 Indians

8 Mexicans

The official reason for the exclusion of the blacks from the East Cell House is the conviction on the part of the penitentiary officials that trouble would result in which people would be hurt if blacks lived in the East Cell House. Warden Sigler's testimony as to the reason for the official policy of segregation may be summarized as follows:

He has been warden of this prison since 1959. He has no prejudice against any person because of the color of that person's skin and he, the warden, would have blacks in the East Cell House if it were safe to do so. Putting blacks in the East Cell House would cause uncontrollable trouble between the black and white races. Recently one white man was sexually assaulted by three black men. Almost immediately thereafter a sit-down strike in the mess hall occurred. A small percentage of black men in prisons have a tendency to prey on young, weak, white men and he has had sexual assault incidents occur involving not only blacks assaulting whites but assaults involving every race. The racial problem in Nebraska is between the black and white races only. Some blacks are angry and some whites are angry. The racial problem in the Nebraska Penal and Correctional Complex revolves around men who are the most difficult to handle. Regular and frequent conversations occur among staff members about how complete integration can be brought about.

In 1966 racial tension led to an assault on a guard from which a full investigation of the racial situation was requested by the warden of the governor and of a legislative committee. Investigations by both were made.

Movement of persons into and from the cells in the East Cell House is normally done several times a day in large groups of inmates, but each cell can be opened singly or in combination with any others. About 100 blacks are in the West Cell House and there are 240 men (Caucasian, Orientals and Indians) in the East Cell House.

The West Cell House is poorer than the East Cell House and is "bad, real bad" because it is 94 or 96 years old. Switching all the blacks to the East Cell House would not solve the racial problem, but it would result in the blacks having the better accommodations of the East Cell House. He sees no way of improving the present operation. Only two general living units are available as compared with many at some other penal institutions.

## APPLICATION OF EQUAL PROTECTION

### I.

 The philosophical underpinnings of a policy of nonsegregation are now durably established by Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). A restatement of them here may be warranted for refreshing of memories and renewing of conviction. Segregation of people on the sole basis of race is destructive to those in the minority.

> "The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the negro group. A sense of inferiority affects the motivation of a child to learn." 347 U.S. at 494, 74 S.Ct. at 691.

That the setting is a state penal complex, rather than a state school, affords no ground for a materially different effect. Rehabilitation, which is education in every sense, is one primary goal of imprisonment. That rehabilitative process for adults is at least as difficult and demanding as the educative process for children. One process should not suffer from greater obstacles to success than the other. Furthermore, respect for the law cannot be achieved by a denial of the equal protection of the law to those of a minority race because of their race.

This is the essence of the equal protection clause of the Fourteenth Amendment to the Constitution of the United States respecting racial matters.

### II.

Other federal courts have refused to draw distinctions in the applicability of the equal protection clause to schools, prisons, reform schools, and mental hospitals and regularly have held official racial segregation to be constitutionally impermissible. See Bolden v. Pegelow, 329 F.2d 95 (C.A. 5th Cir. 1964); Singleton v. Board of Commissioners of State Institutions, 356 F.2d 771 (C.A. 5th Cir. 1966); Rivers v. Royster, 360 F.2d 592 (C.A. 4th Cir. 1966); Dixon v. Duncan, 218 F.Supp. 157 (U.S.D.C.E.D.Va. 1963); Major v. Sowers, 298 F.Supp. 1039 (U.S.D.C.E.D.La.1969); Marable v. Alabama Mental Health Board, 297 F.Supp. 291 (U.S.D.C.M.D.Ala.1969); Board of Managers of Arkansas Training School for Boys v. George, 377 F.2d 228 (C.A. 8th Cir. 1967); Washington v. Lee, 263 F.Supp. 327 (U.S.D.C.M.D.Ala. 1966), aff'd sub nom. 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968); and Wilson v. Kelley, 294 F.Supp. 1005 (U.S. D.C.N.D.Ga.1968), aff'd 393 U.S. 266, 89 S.Ct. 477, 21 L.Ed.2d 425 (1968). The consistency of these decisions demonstrates the federal court's firm insistence that the demands of equal protection permeate the penal system, as well as other governmentally operated institutions.

Ultimately the decision here to be reached is controlled by the holding of the United States Court of Appeals for the Eighth Circuit, Board of Managers of Arkansas Training School for Boys v. George, supra. In declaring unconstitutional an Arkansas statute which segregated the places of confinement of dependent or delinquent boys on the basis of race the court said:

> "Although we do not base our decision upon a determination that these training schools are educational institutions, we only comment that it is the legislative declaration of the Arkansas people that these schools are not to be considered as 'penal' in nature. Ark. Stats.Anno. §§ 46–305, 46–321. By legislative fiat these schools are an integral part of the educational system in the State of Arkansas. * * *

> *"However, to adopt the appellants' pernicious brand that these institutions are 'penal' in nature leads nowhere. Penal institutions are public institutions and are not exempt from constitutional limitations.* Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030. Our holdings in Lee v. Tahash, 8 Cir., 352 F.2d 970, and Harris v. Settle, 8 Cir., 322 F.2d 908, do not authorize discrimination in violation of

constitutional prohibitions. (Emphasis added.)

\* \* \* \* \* \*

"To the extent that §§ 46–301–46–360 of the Arkansas statutes require segregation of juveniles to white schools or colored schools, based solely upon the race of the individual involved, the statutes are clearly unconstitutional; to the extent that the statutes require commitment to segregated facilities, they are clearly unconstitutional; to the extent that the statutes require maintenance of segregated facilities they are clearly unconstitutional. \* \* \* (U)nder no circumstance should race become a determinative factor in assignment. All children, white or colored, must be assigned to either school *in accordance with any approved plan of desegregation.*"

The policy of segregation enforced at the Nebraska Penal and Correctional Complex is not distinguishable from that in the *George* case on the ground that the segregation is not derived from state statute but is found in the custom, usage or practices adopted by the prison administration. The segregation is as real and as state-enforced in the one as in the other. See Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). Neither can it be said that segregation in one general living unit differs in principle from separation by race in assignments to reform schools.

In Washington v. Lee, supra, a three-judge court held an Alabama statute that maintained segregated state, county and city penal institutions in that state was unconstitutional. The defense of the statute was:

" \* \* \* (T)hat the practice of racial segregation in penal facilities is a matter of routine prison security and discipline and is, therefore, not within the scope of permissible inquiry by the courts."

The court rejected the "hands-off doctrine," which would have deferred to the discretion of the prison warden, and held:

" \* \* \* Since Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and the numerous cases implementing that decision, it is unmistakably clear that racial discrimination by governmental authorities in the use of public facilities cannot be tolerated. As stated by the Fifth Circuit in Singleton v. Board of Commissioners, supra:

> Twelve years ago, in Brown v. Board of Education of Topeka, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, the Supreme Court effectively foreclosed the question of whether a State may maintain racially segregated schools. The principle extends to all institutions controlled or operated by the State. '[I]t is no longer open to question that a State may not constitutionally require segregation of public facilities.' Johnson v. State of Virginia, 1963, 373 U.S. 61, 62, 83 S.Ct. 1053, 10 L.Ed. 2d 195. 356 F.2d at 772.

" \* \* \* (T)his Court can conceive of no consideration of prison security or discipline which will sustain the constitutionality of state statutes that on their face require complete and permanent segregation of the races in all the Alabama penal facilities. \* \* \* "

The court acknowledged that in certain circumstances segregation may be resorted to, but only under stringent conditions, declaring:

"\* \* \* (I)n some isolated instances prison security and discipline necessitates segregation of the races for a limited period. However, recognition of such instances does nothing to bolster the statutes or the general practice that requires or permits prison or jail officials to separate the races arbitrarily."

This decision of the three-judge panel in Washington v. Lee was affirmed per curiam by the United States Supreme Court in Lee v. Washington, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968), saying that the desegregation order was "unexceptionable."

In Wilson v. Kelley, supra, a three-judge panel declared unconstitutional a Georgia statute which required segregation of the state's prisons on the basis of race.

### III.

The strongest argument presented to this court as continuing justification of the state-sponsored and state-enforced segregation is that integration of the East Cell House would endanger internal prison security. Prison officials estimated that fifty of the present white occupants of the East Cell House have vocalized their personal predilections against integration of that housing unit and would be violent in their resistance to it.

I am not unimpressed by the argument. Racist attitudes evoke powerful responses in those who possess them. But powerful responses are also available to those who must strive to eliminate the effects of bigotry. The duty of this court and of state penal officials is clear and unavoidable. In meeting a contention that violence or threatened violence warrants a continuous policy of segregation of public schools the Supreme Court noted that:

"After a hearing the District Court granted the relief requested by the Board. Among other things the court found that the past year at Central High School had been attended by conditions of 'chaos, bedlam and turmoil'; that there were 'repeated incidents of more or less serious violence directed against the Negro students and their property'; that there was 'tension and unrest among the school administrators, the class-room teachers, the pupils, and the latters' parents, which inevitably had an adverse effect upon the educational program'; that a school official was threatened with violence; that a 'serious financial burden' had been cast on the School District; that the education of the students had suffered 'and under existing conditions will continue to suffer'; that the Board would continue to need 'military assistance or its equivalent';

that the local police department would not be able 'to detail enough men to afford the necessary protection'; and that the situation was 'intolerable.' [Aaron v. Cooper] 163 F.Supp. [13], at 20–26."

The Supreme Court said:

" * * * We likewise have accepted the findings of the District Court as to the conditions at Central High School during the 1957–1958 school year, and also the findings that the educational progress of all the students, white and colored, of that school has suffered and will continue to suffer if the conditions which prevailed last year are permitted to continue."

and then held:

"The constitutional rights of respondents are not to be sacrificed or yielded to the violence and disorder which have followed upon the actions of the Governor and Legislature. As this Court said some 41 years ago in a unanimous opinion in a case involving another aspect of racial segregation: 'It is urged that this proposed segregation will promote the public peace by preventing race conflicts. Desirable as this is, and important as is the preservation of the public peace, this aim cannot be accomplished by laws or ordinances which deny rights created or protected by the Federal Constitution.' Buchanan v. Warley, 245 U.S. 60, 81 [38 S.Ct. 16, 20, 62 L.Ed. 149]. Thus law and order are not here to be preserved by depriving the Negro children of their constitutional rights." Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958)

In Rentfrow v. Carter, 296 F.Supp. 301 (U.S.D.C.N.D.Ga.1968) ten Georgia state prisoners sought to enjoin the order issued by the three-judge panel in Wilson v. Kelley. The petitioners speculated that violence would erupt if the order were implemented, without a proviso allowing "freedom of choice." The court noted that implementation of the desegregation order had not generated prison violence or disorder. The petitioners'

prediction of violence as a consequence of integration brought the following response from the district court.

"In this connection, the court is not unaware that '[t]he association between men in correctional institutions is closer and more fraught with physical danger and psychological pressures than is almost any other kind of association between human beings.' Washington v. Lee, 263 F.Supp. 332 (quoting from Edwards v. Sard, 250 F.Supp. 977 (D. D.C.1966)). Moreover, the court realizes that racial tensions will undoubtedly increase the friction between Reidsville inmates. But these tensions do not constitute a license for 'violent resistance' which, according to the petitioners, 'should and would' be employed by members of their class, to halt desegregation. Rather, the tensions generate a need for a higher degree of restraint, for those who follow the path of 'violent resistance' will not halt desegregation, but will merely bring their own conduct to a halt by disciplinary action and criminal sanctions."

I agree with the *Rentfrow* rationale. Threats of recalcitrant prisoners whose racial prejudices are erected to defy the constitutional rights of black prisoners need to be quashed. The prisoners who threaten violence, rather than those who seek their right to nondiscriminatory treatment, should be the ones to feel the weight of the consequences of their overt bigotry. An image of the whole penal system of Nebraska being held at bay by fifty men is unacceptable.

Let it be understood that this court in no way thinks that the prison officials at the Nebraska Penal and Correctional Complex have acted in bad faith or with evil motive in their policy of maintaining segregated general living quarters at the penitentiary unit. The evidence is persuasive that the officials' personal inclinations are toward further integration. Nevertheless, the failure fully to integrate is not thereby justified. See Hawkins v. Town of Shaw, 437 F.2d 1286 (C.A. 5th Cir., January 28, 1971).

## IV.

On April 20, 1967, this court through Judge Van Pelt in Moss v. Sigler, Civ. 879 L (unpublished memorandum) refused to order desegregation of the East Cell House of the Nebraska Penal and Correctional Complex. Fervent respect for the author of the opinion in that case impels me to comment about the decision. Three observations are relevant. First, in the *Moss* case the petitioners who sought desegregation expressly withdrew any contention that the accommodations in the East Cell House were more comfortable than other areas where inmates were housed. In the present case on the other hand, the evidence is convincing that the facilities of the East Cell House are more desirable than those of the West Cell House. The significance of this is at once apparent when it is noted that the white inmates who are most prejudiced are invariably afforded the more commodious of the two general living units. This practice serves to reinforce the prejudices and to preserve the overhanging threat of danger to the institution. Even by the now rejected "separate but equal" standard of Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), the prison's practice falls short of constitutional levels.

Second, at the time of the *Moss* decision the opinion of the Circuit Court of Appeals for the Eighth Circuit in Board of Managers of Arkansas Training School for Boys v. George, supra, had not been handed down. The thrust of that opinion, announced May 23, 1967, has already been alluded to herein and now must be used for guidance in this circuit.

Third, the passage of time and the movement of events insist upon a relentless press toward complete nonsegregation of every aspect of public institutions. From a comparison of the findings in the *Moss* case with the evidence in the present case, it appears that in the four years since the *Moss* decision no perceptible change toward integration of the East Cell House has occurred. No doubt

remains of the need to move with dispatch toward that end.

## STANDING

■ Whether these plaintiffs have standing to raise the constitutional issue because of their present confinement to the maximum security unit has been raised by the defendant. I hold that these plaintiffs do have standing to raise the issue, (Cf. Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953)) in light of the fact that the plaintiff McClelland is white and the plaintiff Rowland is black, that the present confinement in the maximum security unit at the Nebraska Penal and Correctional Complex is a temporary disciplinary measure, that both have resided in the general living units but Rowland has never been permitted to reside in the East Cell House, and that in all probability after release from the maximum security unit the plaintiffs will return to the general living unit, the plaintiff Rowland under present policies not to be admitted to the East Cell House.

## RELIEF

The plaintiffs in this case have not sought to institute a class action under Rule 23(b) (2) of the Federal Rules of Civil Procedure to vindicate the rights of all black inmates. Therefore, I find that Rule 19(a) (1) of the Federal Rules of Civil Procedure has not been complied with, because "complete relief cannot be awarded among those already parties." Therefore, I shall order that the plaintiffs shall have ten days from the date of the order in this case to amend the complaint pursuant to Rule 15 of the Federal Rules of Civil Procedure. When the complaint is amended the court will determine whether there then is a proper class action and determine the appropriate relief. If the plaintiffs do not amend the complaint within ten days, this action will stand dismissed without prejudice, because the mandatory language of Rule 19 prevents the court from according

complete relief. The court shall retain jurisdiction for the ten-day period to allow for amendment of the complaint.

An appropriate order will be entered this day.