UNITED STATES of America, Plaintiff-Appellant,

v.

WYANDOTTE COUNTY, KANSAS et al., Defendants-Appellees.

No. 72-1633.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted March 30, 1973.

Decided June 21, 1973.

James P. Turner; Washington, D. C., for plaintiff-appellant.

Nick A. Tomasic, Kansas City, Kan., for defendant-appellee Atty. Gen. for the 29th Judicial District of Kansas.

Robert J. Foster, Kansas City, Kan., for defendant-appellee Board of Commissioners of Wyandotte County.

Before LEWIS, Chief Judge, BARRETT, Circuit Judge, and TALBOT SMITH,* Senior District Judge.

PER CURIAM.

This case concerns the assignment of prisoners on a racial basis to areas of incarceration in the Wyandotte County Jail, Kansas City, Kansas. The action (seeking injunctive relief) was filed by the Attorney General of the United States pursuant to Section 301(a) and (b) of Title III of the Civil Rights Act of 1964 (42 U.S.C. § 2000b(a) and (b)). It was the charge of the complaint that the Wyandotte County Jail is a "public facility" within the meaning of the Act [1] and that the defendants maintained racially segregated jail facilities in violation of Title III, the Equal Protection Clause of the Fourteenth Amendment and a written contract [2] containing a no-discrimination clause between the Director of the Federal Bureau of Prisons and Wyandotte County, Kansas.

There is no dispute concerning the essential facts. As the district court found "Assignment to one of the two tanks [an East tank and a West tank] is made upon a racial basis, with Negroes generally being assigned to the East tank, and white prisoners being assigned to the West tank." [3] Nevertheless the district court entered its memorandum opinion and order, 343 F.Supp. 1189, dismissing the complaint and denying all relief requested by the United States.

■ We need not labor the point that a State may not constitutionally require segregation of public facilities, Johnson v. Virginia, 373 U.S. 61, 83 S.Ct. 1053, 10 L.Ed.2d 195 (1963), and the principle is as applicable to jails as to other public facilities, Lee v. Washington, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968).

The defense to the charges made was that the segregation employed was "not intentional or systematic segregation but was a result of and justified by a desire to protect individuals against personal abuses and violence," reliance being placed upon the statement in the concurring opinion in Lee v. Washing-

---

* Eastern District of Michigan, sitting by designation.

1. 42 U.S.C. § 2000b(a) provides in part that:

"Whenever the Attorney General receives a complaint in writing signed by an individual to the effect that he is being deprived of or threatened with the loss of his right to the equal protection of the laws, on account of his race, color, religion, or national origin, by being denied equal utilization of any public facility which is owned, operated, or managed by or on behalf of any State or subdivision thereof . . . and the Attorney General believes the complaint is meritorious and certifies that the signer or signers of such complaint are unable, in his judgment, to initiate and maintain appropriate legal proceedings for relief and that the institution of an action will materially further the orderly progress of desegregation in public facilities, the Attorney General is authorized to institute for or in the name of the United States a civil action in any appropriate district court . . . against such parties and for such relief as may be appropriate, and such court shall have and shall exercise jurisdiction of proceedings instituted pursuant to this section . . . ."

2. See 18 U.S.C. § 4002.

3. The general plan of "tank" assignments in the jail is based upon a number of criteria. The worst security risks, those persons believed to be prone to excessive violence, or to escape attempts, are confined in what is known as the "northwest tank" having locked cells with no "tank area." Those with somewhat lesser problems, having, for example, been guilty of misbehavior while in the general prison population, those requiring protection from others, and, generally, the "problem prisoners" are assigned to cells in the northeast tank. Minor and young offenders are assigned cells in the "boys' tank," those with illnesses in the "drunk" and "sick" tanks, and women to the "women's tank."

All of the above assignments are made without regard to race.

The balance of the routine prisoners are confined in the East and West tanks on the basis of race, whites in the West tank, Negroes in the East tank.

ton, supra, to the effect that "prison authorities have the right, acting in good faith and in particularized circumstances, to take into account racial tensions in maintaining security, discipline, and good order in prisons and jails."

We cannot construe this caveat as authorizing the consistent and settled practice of "Negroes to the East tank, whites West tank," we have before us. The use of the words "particularized circumstances" is significant, the quoted clause doing no more than recognizing the commonly accepted principle[4] that in the administration of prison affairs there may arise unusual situations in which security and discipline demand segregation for limited periods.

The record before us, moreover, does not warrant even the limited and isolated segregation recognized as permissible in penal situations of unusual stress. The practice of segregation had had its origins in this jail "a few years back." The present Sheriff and the Undersheriff both had been told that when the races had been placed together at that time, violence had resulted because, it was said, of racial tensions. Consequently, as the Sheriff testified, "It was already segregated when I got there and I just continued to practice on the advice of some of my predecessors and the personnel that worked there."[5] However, the Sheriff personally knew of no specific examples of interracial violence during his tenure, and although racial fights had occurred "once in a while," they occurred no more frequently than for other reasons. A former jailer, Mr. Govers, testified in fact that he knew of no fights engendered by racial animus. Warden Pacheco was of the opinion that they occurred "once in a while." "More frequently," he was asked, "than fights for other reasons?" "No," he replied,

"I don't think so." Fighting actually seems to have occurred less frequently among inmates in the integrated areas (here the violent and problem cases) than in the segregated tanks.

There was some attempt at the trial to justify the segregation here imposed on the ground that the inmates of these two tanks were "hardened" criminals with such propensities to violence that segregation was necessary for the "safety of everybody concerned." The actual administration of the institution does not support the claim. The real problem makers are sent to the non-segregated northwest and northeast tanks. The balance, except for such special cases as drunks, juveniles and women, are sent to the segregated tanks, the populations of which range in years from 16, 17 and 18 through the 40's and 50's and in offense from misdemeanor, "joy rider," traffic violator, burglar, armed robber and narcotic offender to convicted murderer.[6] The appellation of "hardened criminal" to such a routine mix would, without more, seem manifestly inappropriate.

■ What all of the above finally boils down to is a vague fear on the part of the authorities that desegregation may result in violence. This is not enough. The words of the Supreme Court in Watson v. Memphis, 373 U.S. 526, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963), are peculiarly appropriate to the record before us: "[N]either the asserted fears of violence and tumult nor the asserted inability to preserve the peace was demonstrated at trial to be anything more than personal speculations or vague disquietudes of city officials." 373 U.S. at 536, 83 S.Ct. at 1320.

But beyond this, the argument that desegregation of public facilities might provoke violence has never been accepted

---

4. *E. g.*, McClelland v. Sigler, 327 F.Supp. 829 (D.Neb.1971), aff'd 456 F.2d 1266 (8th Cir. 1972); Washington v. Lee, 263 F.Supp. 327 (M.D.Ala.1966), aff'd 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968).

5. App. 29.

6. Jail census prepared by the Warden for the Federal Bureau of Investigation, Jan. 28, 1970.

to justify unconstitutional segregation. Over fifty years ago it was held that,

"It is urged that this proposed segregation will promote the public peace by preventing race conflicts. Desirable as this is, and important as is the preservation of public peace, this aim cannot be accomplished by laws or ordinances which deny rights created or protected by the federal Constitution." Buchanan v. Warley, 245 U.S. 60 at 81, 38 S.Ct. 16 at 20, 62 L.Ed. 149.

The years following have seen no dilution of the principle here expressed. See, *e. g.,* Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958) (desegregation of schools); Watson v. Memphis, supra (desegregation of public parks).

Nor has the application of the principle been excluded from the administration of correctional institutions. See, *e. g.,* McClelland v. Sigler, supra; Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark.1970), aff'd, 442 F.2d 304 (8th Cir. 1971); Wilson v. Kelley, 294 F.Supp. 1005 (N. D.Ga.1968), aff'd, 393 U.S. 266, 89 S.Ct. 477, 21 L.Ed.2d 425 (1968); Rentfrow v. Carter, 296 F.Supp. 301 (N.D.Ga.1968); Washington v. Lee, supra. Peculiarly appropriate at this point are the words of the district court in McClelland v. Sigler, supra, with respect to a similar problem.

"Threats of recalcitrant prisoners whose racial prejudices are erected to defy the constitutional rights of black prisoners need to be quashed. The prisoners who threaten violence, rather than those who seek their right to nondiscriminatory treatment, should be the ones to feel the weight of the consequences of their overt bigotry." 327 F.Supp. at 834.

The decision below is reversed and the cause remanded for further proceedings not inconsistent herewith.