Ralph Luther BLEVINS, Plaintiff,

v.

William BREW, Defendant.

No. 83–C–85–C.

United States District Court, W.D. Wisconsin.

Aug. 29, 1984.

Ralph Blevins, pro se.

John Vaudreuil, Asst. U.S. Atty., Madison, Wis., for defendant.

## ORDER

CRABB, Chief Judge.

In an order entered on February 2, 1984, I determined that defendant's actions in segregating inmates by race in cell assignments in the Admission and Orientation Unit at the Federal Correctional Institution in Oxford, Wisconsin violated the equal protection clause of the United States Constitution. In reaching that conclusion, I noted that defendant had shown no compelling state interest that might justify the racial segregation practice.

On June 4, 1984, a trial was held to determine the two issues remaining in this case: qualified immunity and damages. Defendant was permitted to introduce evidence that he is entitled to the good faith immunity defense on the issue whether a compelling state interest justified the practice of racial segregation. Plaintiff was permitted to introduce evidence on the issue of punitive and compensatory damages.

From the evidence adduced at trial, I find the following facts.

## FACTS

From 1976 until August, 1979, defendant was employed at the Federal Correctional Institution in Oxford, Wisconsin. In 1977, defendant became a correctional counselor, assigned to the Admission and Orientation Unit.

The Admission and Orientation Unit is used for temporary housing of new inmates arriving at Oxford. Incoming inmates spend between ten to fourteen days in this unit while they are introduced to the programs and jobs available at the institution and learn the institution rules. The staff uses this period to evaluate the new inmates in preparation for their placement in the general population.

During the time relevant to this action, incoming inmates arrived on buses from various other federal institutions. On the day that a bus was due to arrive, defendant would receive a list of arriving inmates showing the name and race of each inmate and the institution to which he had previously been assigned. Generally, defendant would make the cell assignments before the bus arrived, because the incoming inmates would not arrive until after the program staff had finished their shifts and had left the institution. Ordinarily, defendant and other institutional staff had no opportunity to review the incoming inmates' central files in advance of their arrival or to interview the incoming inmates after the bus arrived and before the evening lockdown at 10:00 p.m.

Defendant attempted to place as many incoming inmates as possible in single cells. However, when a bus arrived with a full load of inmates, he did not have enough cells and had to double-cell four to six inmates. Defendant made the double-celling assignments by race: black inmates

were double-celled with black inmates and white inmates with white inmates.

All inmates in the Admission and Orientation Unit were locked in their cells from 10:00 p.m. until 6:00 a.m. the following morning. At all other times, inmates were allowed to associate with other inmates and to participate in lectures, classes, and tours open to the general prison population.

On the day following their arrival, inmates could request adjustments in their cell assignments. At this time, defendant could interview the inmates and review their central files. Defendant did not consider race as a factor in making adjustments in cell assignments.

Through his experience as a correctional counselor, defendant was aware of the growing prominence within prisons of groups advocating racial hatred. Defendant believed that because racial hostility was a danger, he would be subjecting incoming inmates to a substantial risk of injury if he placed two inmates of different races in the same cell.

In December, 1978, plaintiff, a black inmate, was moved from the United States Penitentiary in Marion, Illinois to the Federal Correctional Institution in Oxford, Wisconsin. He arrived at Oxford on a full bus carrying approximately thirty inmates and was assigned to a double cell in the Admission and Orientation Unit with another black inmate.[1] Plaintiff remained in the Admission and Orientation Unit between ten to fourteen days.

Plaintiff perceived his restriction to a segregated cell as degrading, reminiscent of the racial segregation practices that had pervaded his childhood. He suffered mental anguish as a result of this segregation practice.

Defendant received no complaints from plaintiff regarding his cell assignment during the time he was assigned to the Admission and Orientation Unit.

In 1978, defendant knew that it was a violation of the United States Constitution to use race as a basis for making cell assignments in areas of the institution other than the Admission and Orientation unit. Defendant never sought legal advice concerning his practice of making the initial Admission and Orientation unit double-celling assignments by race. Defendant never advised the warden or any of his superiors that he was using race as a basis for these assignments or sought alternative methods for protecting the newly arriving inmates from the possibility of racial conflict and injury.

## OPINION

### Good Faith Immunity

In the order entered on February 2, 1984, I determined (and defendant now concedes) that assigning cells in the Admission and Orientation Unit according to race did not serve a compelling state interest and therefore violated the equal protection clause. Defendant also concedes that it was clearly established in 1978 that it was a violation of the equal protection clause to make prison cell assignments by race in the absence of a compelling state interest. However, defendant contends that in 1978 the contours of this compelling state interest exception were ill-defined and imprecise so that a reasonable person would not have known that the need to protect newly-arriving inmates from the risk of racially-moti-

---

1. Plaintiff attached to his brief an affidavit of Augustus Marshall, in which Marshall avers that plaintiff was placed in a double cell in the Admission and Orientation Unit with Marshall who is black. Defendant has filed a motion to strike this affidavit because it was offered after the conclusion of trial when defendant did not have an opportunity to rebut the evidence.
In finding that plaintiff was double celled with another black inmate in the Admission and Orientation Unit, I did not place any reliance upon this affidavit. Rather, I weighed the trial testimony of both plaintiff and defendant and found plaintiff's assertions more persuasive on this point. Defendant testified that he did not believe he had placed plaintiff in a double cell upon arrival because it was defendant's practice not to double-cell any inmates arriving from the penitentiary in Marion, Illinois. Plaintiff's recollection on this issue is more direct: he was not placed in a single cell.

vated assaults during their first nights in the Admission and Orientation Unit did not constitute such a compelling state interest. The question for the court is whether the law was so clear in December, 1978 that a reasonable official would have known that his celling practices were unlawful.[2]

■■■ Since the early 1970's, it has been clear that "racial segregation, which is unconstitutional outside prisons, is unconstitutional within prisons, save for 'the necessities of prison security and discipline.'" *Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972), citing *Lee v. Washington,* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968). The prison security and discipline exception is a narrow one:

> [P]rison authorities have the right, acting in good faith and *in particularized circumstances,* to take into account racial tensions in maintaining security, discipline, and good order in prisons and jails.

*Lee v. Washington,* 390 U.S. at 334, 88 S.Ct. at 995 (emphasis added). In order to justify segregation practices that infringe on the constitutional rights of inmates, prison officials must show that the practices were necessitated by extreme or exigent circumstances involving racial conflict. *United States v. Wyandotte County, Kansas,* 480 F.2d 969, 971 (10th Cir.) (per curiam), *cert. denied,* 414 U.S. 1068, 94 S.Ct. 577, 38 L.Ed.2d 473 (1973). A generalized expectation of racial violence is not a sufficient justification for racial segregation. *See Mickens v. Winston,* 462 F.Supp. 910, 912 (E.D.Va.1978), *aff'd without opinion,* 609 F.2d 508 (4th Cir.1979), quoting from the lower court opinion in *Lee v. Washington,* where the three-judge panel declared:

> [I]n some isolated instances prison security and discipline necessitates [sic] segregation of the races for a limited period. However, recognition of such instances does nothing to bolster the ... general practice that requires or permits prison or jail officials to separate the races arbitrarily.

263 F.Supp. 327, 331 (M.D.Ala.1966). *See also Battle v. Anderson,* 376 F.Supp. 402, 420–21 (E.D.Okla.1974). Evidence of racial violence or tensions at some time in the past does not justify a continuous segregation practice. *United States v. Wyandotte County, Kansas,* 480 F.2d at 971. *McClelland v. Sigler,* 327 F.Supp. 829, 833–34 (D.Neb.1971), *aff'd,* 456 F.2d 1266 (8th Cir. 1972) (per curiam); *Rentfrow v. Carter,* 296 F.Supp. 301, 303 (N.D.Ga.1968). Indeed, prison authorities have an affirmative duty to remedy unlawful practices. *Thomas v. Pate,* 493 F.2d 151, 155 (7th Cir.1974).

■■■ Even in a particular situation in which the danger of racial conflict is real and not imagined, racial segregation is an appropriate response only if no other means are available for maintaining prison security or discipline. *Mickens v. Winston,* 462 F.Supp. at 912. Other means might include proper supervision, *id.,* segregation of particular inmates who have been involved in racial violence, *Stewart v. Rhodes,* 473 F.Supp. 1185, 1188 (S.D.Ohio 1979), *appeal dismissed,* 661 F.2d 934 (6th Cir.1981), or reduction of the inmate population, *Mickens v. Winston,* 462 F.Supp. at 913.

■■■ Given the state of the law in December, 1978, a reasonable person would have known then that racial segregation of inmates in cell assignments was permissible only in very exceptional and particularized circumstances, and should have known that

---

**2.** In *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the United States Supreme Court held that officials are shielded from liability for civil damages if their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. By so ruling, the Supreme Court eliminated any subjective element of the good faith immunity defense. *Davis v. Scherer,* —— U.S. —— at ——,

104 S.Ct. 3012 at 3019, 82 L.Ed.2d 139 (1984); *McKinley v. Trattles,* 732 F.2d 1320, 1324 (7th Cir.1984). Moreover, it is now clear that the availability of the good faith immunity defense is a question of law for the judge to decide in light of the state of the law. *Harlow v. Fitzgerald,* 457 U.S. at 818–19, 102 S.Ct. at 2738–39; *McKinley v. Trattles,* 732 F.2d at 1324. *See also Joseph v. Brierton,* 739 F.2d 1244 at pp. 1249–1250 (7th Cir.1984).

those circumstances did not exist in the Admission and Orientation Unit.

It is true that whenever defendant designated two unknown inmates to the same cell, he was faced with the potential that the inmates might harm one another, perhaps fatally. Defendant responded to this problem by racially segregating the inmates assigned to double cells. He attempts to support the decision by arguing that it was a particularized occurrence necessitated by the pervasiveness of racial hostility within the prison system. Defendant points out that he was responsible for the safety of the incoming prisoners and contends that he acted only out of concern for their wellbeing.

I do not doubt defendant's sincerity or the genuineness of his sense of obligation to the inmates in his care. Defendant appears to be a conscientious and capable correctional officer. However, the need for racial segregation in cell assignments was never based on more than defendant's vague apprehension that racial problems might arise. In 1978, it was well established that generalized fears of racial violence do not constitute a compelling state interest that may justify a policy of racial segregation. *See United States v. Wyandotte County, Kansas,* 480 F.2d at 971; *Battle v. Anderson,* 376 F.Supp. at 420–21; *McClelland v. Sigler,* 327 F.Supp. at 833–34; and *Rentfrow v. Carter,* 296 F.Supp. at 303.

Moreover, although defendant could argue that his actions were particularized in that they applied only to the night of arrival, in fact the defendant took the same actions every time a full bus arrived, without ever determining whether his actions were correct or whether there were alternative means for dealing with the problems he perceived.[3] Therefore, I conclude that

defendant's policy of racial segregation violated clearly established constitutional rights and that defendant is not immune from liability for civil damages.

### DAMAGES

▆ Plaintiff seeks to recover both compensatory and punitive damages as relief for the harm he suffered as a result of being subjected to racial segregation in the Admission and Orientation Unit. Defendant contends that plaintiff is not entitled to recover more than nominal damages because he was housed in the Admission and Orientation Unit for such a short period of time and because he offered no evidence of physical or medical problems resulting from his mental suffering.

With regard to plaintiff's claim for punitive damages, plaintiff has not shown that defendant acted with malice or reckless disregard for plaintiff's rights. Rather the evidence shows that defendant reacted to what he perceived to be a threat to institutional order in a careful, albeit improper, manner. Therefore, I conclude that punitive damages are not appropriate in this case.

Plaintiff has shown that he suffered mental anguish as a result of being subjected to racial segregation by defendant. Plaintiff does not need to show that he endured physical complications as a result of his emotional state. Bad feelings resulting from intentional racial segregation may support a monetary award, *Mickens v. Winston,* 462 F.Supp. at 913, quoting from *Thomas v. Pate,* 493 F.2d at 163:

That there is present injury to an inmate, intentionally segregated because of his race, is particularly clear if the inmate is black. Because of the relatively small size of the prison community, its closed nature, and the numerous facets of pris-

---

**3.** It is noteworthy that defendant produced no evidence that racial hostility is the only source of problems or even the primary one. Common sense suggests that there would be serious risks in doublecelling an inmate who had been a witness in a trial with the inmate against whom he had testified, or doublecelling a known "snitch," or putting a large and aggressive in-

mate in the same cell with a small, weak inmate. If it was as dangerous as defendant maintains it was to double-cell inmates on the first night before their central files could be reviewed or the inmates could be interviewed by Oxford correctional staff, surely it was dangerous to place any two unknown inmates together, regardless of their races.

on life subject to regulation, any racially discriminatory action by prison officials is likely more effectively to create a badge of inferiority for black inmates than would necessarily attach to minority residents of a city as a result of discriminatory action outside prison walls.

Although I recognize that any assessment of monetary damages must be imprecise, I conclude that an award of $250 constitutes appropriate and fair compensation for the injury inflicted on plaintiff.

### ORDER

IT IS ORDERED that defendant is not entitled to good faith immunity; plaintiff is not entitled to recover punitive damages; and plaintiff is awarded $250 in compensatory damages for defendant's violation of his constitutional rights.