82 F.3d 423
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Armando RAMIREZ, Plaintiff-Appellee,
v.
Jack R. REAGAN; Charles D. Marshall, Warden; C.J. Johnson;
Jourden; R. Linfor; P.J. Dillard; Galbraith Bush;
Lawrence, Program Administrator at Pelican Bay State Prison;
James Gomez, Director of Department of Corrections of the
State of California, Defendants-Appellants.
 No. 95-15048.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 14, 1996.
Decided April 9, 1996.
 
 1
 Before: HALL and BRUNETTI, Circuit Judges, and WEINER, District Judge.*
 
 
 2
 MEMORANDUM**
 
 
 3
 Armando Ramirez, an Hispanic inmate at California's Pelican Bay State Prison, sued under 42 U.S.C. § 1983, alleging that prison officials had discriminated against him on the basis of race when they: (1) subjected Hispanic inmates to a more intensive security-level reclassification review; (2) denied all Hispanic inmates the ability to work as "critical workers" during prison lockdowns; (3) confined Hispanic inmates to a small, concrete exercise yard for observation while allowing inmates of other races to be observed in the main exercise yard. The defendant prison officials moved for summary judgment on the merits and on the basis of qualified immunity, and the district court issued a tentative and final ruling denying their motion. The defendants brought this interlocutory appeal of the district court's order denying their defense of qualified immunity. We have jurisdiction over this interlocutory appeal under 28 U.S.C. § 1291 and Mitchell v. Forsyth, 472 U.S. 511 (1985) and reverse.[1]
 
 I.
 
 4
 Eight years after his conviction of first degree murder, on January 8, 1990, Armando Ramirez was transferred from Folsom State Prison to Pelican Bay State Prison. Ramirez was Hispanic and was from southern California (known as a "Southern Hispanic"); according to confidential sources, Ramirez was affiliated with both the "Carson Barrio Probe" gang, and the "EME" ("Mexican Mafia"), the prominent Southern Hispanic gang. As a result of these affiliations and a prison disciplinary record showing acts of violence,[2] Ramirez was placed in "Close A" custody upon his arrival at Pelican Bay.[3] By February 1992, his custody level had been reduced to "Close B."[4]
 
 
 5
 From January 1990 through Ramirez's transfer to Lancaster State Prison on June 30, 1993, Pelican Bay was racked with intense prison violence--during this period, the Director of the California Department of Corrections was forced to declare a state of emergency at that prison no less than nine times.[5] Prison officials believed that the major portion of this violence was instigated by Southern Hispanic inmates, who attacked Northern Hispanic inmates, Black inmates, and those Southern Hispanic inmates who would not help instigate violence. Indeed, seven of the states of emergencies were declared in the wake of violent incidents involving Southern Hispanics.[6]
 
 
 6
 After one such incident on November 5, 1991, Program Administrator Helsel ordered a lockdown of the prison's Facility B. During a lockdown, inmates are confined to their cells and only those inmates designated as "critical workers" can report to their jobs (and earn credit toward early release). During this lockdown, which lasted until December 11, 1991, Helsel allowed all "critical workers"--except Hispanic critical workers--to report to work.[7]
 
 
 7
 On January 24, 1992, Hispanic and Black inmates from Facility B were involved in another violent incident. Associate Warden C.J. Johnson ordered Facility B locked down and imposed the same no-Hispanic-"critical worker" restriction.[8] Although this lockdown was lifted on February 18, 1992, a third lockdown (with the same restrictions) was imposed on February 24, 1992, two days after a group of Southern Hispanics attacked four Black inmates in the main exercise yard. This lockdown ended on March 6, 1992.
 
 
 8
 In the midst of these lockdowns, Associate Warden Johnson asked Helsel and Correctional Counselor Galbraith to prepare a chart of the violent incidents occurring between November 5, 1991, and February 23, 1992. Galbraith analyzed the 51 incidents that occurred outside the Secured Housing Units, and specifically examined the 23 incidents involving Facility B, which seemed to be a magnet for violence. Those 23 incidents involved 58 inmates--1 White inmate, 5 Black inmates who all belonged to the Bloods street gang, and 52 Hispanic inmates.[9] Although a number of the incident reports indicated that the Hispanics instigated the violence, Gilbraith's chart did not reflect who instigated each incident.
 
 
 9
 Based on the data from Gilbraith's study, prison officials began to reclassify those inmates in Facility B they felt might be most responsible for the violent incidents. They reviewed the files of two groups: Blacks and Hispanics. If a Black inmate's file indicated he was a member of the Bloods street gang, he was scheduled to appear before the classification committee; of the 46 Bloods who appeared before the committee, 16 were raised to "Close A."
 
 
 10
 The officials subjected Hispanic inmates to a more intensive review: If an Hispanic inmate had any gang affiliation or any disciplinary violations in his prison record, he was called before the committee. Of the 160 Hispanic inmates it reviewed, 58 inmates (including Ramirez[10] ) were raised to Close A and 20 others were placed in a "special increased custody program."[11] The officials claimed it was impossible for them to narrow any further the scope of their review of Hispanic inmates, which was aimed at finding those Hispanic inmates responsible for instigating the violence, because: (1) the Hispanics involved in the past incidents, unlike the Blacks who had been, did not belong to any one street gang or did not belong to any gang at all; and (2) the Hispanics orchestrating the violence still remained in the general population, given that segregating the inmates who had been involved in previous violent incidents had not stopped the violence in the general population. The officials reasoned that an Hispanic inmate who had been previously affiliated with any gang, or who had a prison record showing problems, would be more likely to be one of the unknown instigators than an inmate who had neither of the above characteristics.
 
 
 11
 Despite the reclassifications, the violence continued. On January 14, three Hispanic inmates assaulted a Black inmate in the Facility B law library. Facility B was locked down, and Hispanic "critical workers" were again prevented from working. When the lockdown was lifted, Black and White inmates from Facility B were released from their cells onto the main exercise yard for observation--Blacks occupied the yard for half the day, Whites for the other half--before they were released into the general population.[12] Hispanics, however, were released from their cells into four smaller, concrete exercise yards for observation before they were released into the general population. The smaller yards, which had better gun coverage, were easier for the guards to monitor. The prison officials claimed it was necessary to observe the Hispanic inmates more closely since they had been responsible for instigating 28 out of the 45 violent incidents occurring in Facility B between January 15, 1993, and April 10, 1993.[13]
 
 
 12
 On April 23, 1993, Ramirez filed suit under 42 U.S.C. § 1983 alleging violations of due process, the Eighth Amendment, and equal protection.[14] All but the equal protection claim were dismissed on June 11, 1993. Ramirez filed an amended complaint on June 30, 1993, alleging that the defendants violated his equal protection rights by their (1) intensive classification review of Hispanic inmates in Facility B; (2) denial of "critical worker" status to Hispanics during the November 6, 1991, January 24, 1992, February 24, 1992, and January 14, 1993, lockdowns; and (3) confinement of Hispanic inmates to the small, concrete yards for observation.
 
 
 13
 On February 18, 1994, the defendants moved for summary judgment on the merits and on the issue of qualified immunity. The district court tentatively denied their motion. It reasoned that the defendants' actions were facially discriminatory and it could not conclude, under Turner v. Safley, 482 U.S. 78 (1987), and on the proof before it, that these actions were "rationally related" to institutional safety. It gave the defendants 30 days to provide supplemental information. On December 15, 1994, the district court denied the defendants' motion. This interlocutory appeal followed.
 
 II.
 
 14
 We review de novo the district court's denial of summary judgment on qualified immunity. Carnell v. Grimm, 74 F.3d at 978. When a law enforcement officer asserts qualified immunity from liability for civil damages, "the district court must determine whether, in light of clearly established principles governing the conduct in question, the officer objectively could have believed that his conduct was lawful." Act Up!/Portland v. Bagley, 988 F.2d 868, 871 (9th Cir.1993). This inquiry involves a two-step analysis: "(1) Was the law governing the official's conduct clearly established? (2) Under that law, could a reasonable officer have believed the conduct was lawful?" Schroeder v. McDonald, 55 F.3d 454, 461 (9th Cir.1995) (citation omitted). Whether the law was clearly established is a pure question of law for us to decide. Mendoza v. Block, 27 F.3d 1357, 1360 (9th Cir.1994).
 
 A.
 
 15
 The law governing an area is clearly established if the contours of that law are "sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 639 (1987). As a result, it is not necessary that precedent establish that the defendant's exact actions are unlawful. Id. at 640.
 
 
 16
 Since 1972, it has been unlawful for prison officials to segregate prisoners by race except when such segregation is necessary for prison security and discipline. Cruz v. Beto, 405 U.S. 319, 321 (1972) ("[R]acial segregation, which is unlawful outside prisons, is unconstitutional within prisons, save for 'the necessities of prison security and discipline.' ") (emphasis added); Lee v. Washington, 390 U.S. 333, 334 (1968) (Black, J., concurring) ("[P]rison officials have the right, acting in good faith and in particularized circumstances, to take into account racial tensions in maintaining security, discipline, and good order in prisons and jails."). This "security and discipline" exception has been interpreted by courts to ban racial segregation in cell assignments and to ban all other differential treatment of inmates on the basis of race except in circumstances where racial tensions are documented or where differential treatment is necessary. See, e.g., United States v. Wyandotte County, 480 F.2d 969, 971 (10th Cir.), cert. denied, 414 U.S. 1068 (1973) (striking down racial segregation in cell assignments because the facts did not indicate an "unusual situation[ ] in which security and discipline demand[ed] segregation"); Mickens v. Winston, 462 F.Supp. 910, 912 (E.D.Va.), aff'd, 609 F.2d 508 (4th Cir.1979) (same); Knop v. Johnson, 667 F.Supp. 467, 500-01 (W.D.Mich.1987), appeal dismissed, 841 F.2d 1126 (6th Cir.1988) ("[State officials] cannot discriminate on the basis of race in inmate housing, inmate discipline, or in inmate employment"); Finley v. Arkansas Bd. of Corrections, 505 F.2d 194, 209-10 (8th Cir.1974) (finding racial discrimination in disciplinary proceedings and job classifications unconstitutional).
 
 
 17
 In Blevins v. Brew, 593 F.Supp. 245 (W.D.Wis.1984), for example, inmates challenged the prison's practice of assigning cells in the prison's temporary Admission and Orientation Unit on the basis of race. The court denied the defendant officers motion for summary judgment on the basis of qualified immunity, reasoning that racial segregation was only constitutional when "necessitated by extreme or exigent circumstances involving racial hatred" and when "no other means [were] available for maintaining prison security or discipline." Id. at 248. Because the officials in this case knew that racial segregation was constitutional only in "extreme" situations and because they could not have reasonably believed that those circumstances existed in their situation, they were not entitled to qualified immunity. Id. at 248-49.
 
 
 18
 In 1987, the Supreme Court decided Turner v. Safley, 482 U.S. 78 (1987) and set forth a new standard to evaluate all constitutional claims brought by inmates: A prison regulation affecting an inmate's constitutional rights is valid as long as it is "reasonably related to legitimate penological interests." Id. at 89. In so doing, the Court ostensibly expanded Cruz 's "security and discipline" exception and thereby lightened the burden prison officials bear in justifying race-based policies. Compare Blevins, 593 F.Supp. at 248 (requiring "no other means [to be] available for maintaining prison security or discipline") with Turner, 482 U.S. at 90-91 (stating that Turner is "not a 'least restrictive alternatives' test" so that only the absence of "easy, obvious alternatives" invalidates a regulation); see also White v. Morris, 832 F.Supp. 1129 (S.D.Ohio 1993) (upholding temporary racial segregation of inmates when security records were destroyed in the wake of "worst prison riot in Ohio history").
 
 
 19
 Because Turner was decided more than two years before the conduct at issue in this case, we find that Turner, which is the law governing the defendants' conduct, was clearly established. Accord Trimble v. Gardner, 860 F.2d 321, 325 (9th Cir.1988), cert. denied, 490 U.S. 1075 (1989) (holding that Turner was clearly established law in 1988 in the Fourth Amendment search and seizure context).
 
 B.
 
 20
 We stress at the outset that our next inquiry for qualified immunity purposes is a narrow one: We do not decide whether the defendants' race-based actions were in fact reasonably related to the legitimate penological interest of prison security, see Manhattan Beach Police Officers Ass'n, Inc. v. City of Manhattan Beach, 881 F.2d 816, 818 (9th Cir.1989) ("[O]ur task is not to determine whether the defendants' conduct actually violated clearly established statutory or constitutional rights ...")--we only decide whether the defendants could have reasonably believed that their actions were reasonably related to prison security[15] under the law as it was established from 1990 to 1993. See Hunter v. Bryant, 112 S.Ct. 534, 537 (1992) ("The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law' ") (citation omitted).
 
 1.
 
 21
 We believe that the defendants could have reasonably believed that their greater scrutiny of the Hispanic inmates in Facility B for possible reclassification was reasonably related to safety. Seven of the nine states of emergency were called in response to violence involving Hispanic inmates, and 52 of the 58 inmates involved in violence during Gilbraith's three-month study were Hispanic.[16] It was therefore reasonable to believe that Hispanics were, as a group, more likely to be violent than other groups and thus more worthy of closer scrutiny. Nor do we believe that the defendants cast the net of their scrutiny too widely. Prison officials need not wait for an unknown instigator to incite riot before acting against him. See Gillard v. Oswald, 552 F.2d 456, 458-59 (2d Cir.1977) (upholding confinement of 140 inmates who were listed as "disruptive or potentially disruptive" during a period of violent assaults, although no charges were pending against them). The incident reports did not indicate that only Hispanic gang members were involved in the disturbances--it was therefore reasonable for the defendants to believe that reclassifying only gang members would not stop all the violence. It was also reasonable to examine more closely those inmates with past disciplinary problems since they would logically be more likely to be disruptive than those prisoners with no history of past problems. While we agree with Ramirez that the defendants could have confined their scrutiny to Southern Hispanics (who were the Hispanic group more often involved in the violent incidents), we reiterate that Turner does not require the least restrictive alternative. Turner, 482 U.S. at 90. We find that the defendants could have reasonably believed that reviewing the subset of Hispanic inmates that they did was reasonably related to prison security.
 
 2.
 
 22
 We are more troubled by the defendants' treatment of Hispanic "critical workers" during the four lockdowns of Facility B. In normal circumstances, we would want to know why the defendants did not also deny Blacks who were members of the Bloods street gang critical worker status, when they were involved in many of the same violent incidents as the Hispanics who were denied that status. The defendants in this case were not, however, operating in "normal circumstances." Although they did not face a full scale riot like the prison officials in White, Pelicans Bay's recent history of Hispanic violence, as evidenced by numerous lockdowns and states of emergency, meant that the threat of such a riot was not imaginary. In such dire circumstances, we will not require of prison officials the same calm deliberation that we give to what is reasonable.[17] In this case, the defendants knew that Hispanic inmates were a lightning rod for violence, but did not know which inmates instigated the outbreaks. With prison resources stretched to the limits enforcing the lockdown, the defendants could have reasonably believed that they could not chance further violent episodes in the workrooms. Their actions are not the actions of "the plainly incompetent or those who knowingly violate the law." Hunter, 112 S.Ct. at 537.
 
 3.
 
 23
 We also conclude that the defendants were not unreasonable in their belief that confining Hispanic inmates coming off of lockdown to the small, concrete yards for observation was reasonably related to security. Ramirez observes that many of the conflicts involving Hispanic inmates were intra-racial,[18] so that the defendants' practice might actually instigate more violence. This misses the point, however. The smaller yards had better gun coverage, so that the violence--no matter what the target--could be better controlled. We find it reasonable for the defendants to have believed that watching more closely the group of inmates who were involved in the majority of violent incidents advanced prison security.
 
 
 24
 REVERSED.
 
 
 
 *
 The Honorable Charles R. Weiner, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 We reject Ramirez's contention that Johnson v. Jones, 115 S.Ct. 2151 (1995), bars this interlocutory appeal. Johnson deals with the situation in which a defendant moves for summary judgment on the basis that no genuine issues of fact exist as to his eligibility for qualified immunity; in that particular context, the defendant public official may not file an interlocutory appeal challenging the district court's ruling that a genuine issue of facts exists. See Johnson, 115 S.Ct. at 2159 ("[A] defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial."); see also Carnell v. Grimm, 74 F.3d 977, 980 (9th Cir.1996) (finding no jurisdiction over interlocutory appeal where district court denied defendant's motion for qualified immunity on the ground that a genuine issue of fact existed); Pellegrino v. United States, 73 F.3d 934, 936 (9th Cir.1996) (same); Armendariz v. Penman, 75 F.3d 1311, 1317-18 (9th Cir.1996) (en banc)
 In this case, defendants did not move for summary judgment on the ground that no genuine issues of fact existed regarding their liability and the district court's order denying qualified immunity did not rest on the existence of any such issues of fact. This case does not therefore fit within Johnson 's exception.
 
 
 [2]
 Ramirez's disciplinary record showed the following: (1) possession of a weapon (June 21, 1982); (2) possession of weapon and assault on inmate (June 20, 1986); (3) involvement in Mexican/Black conflict (February 23, 1988); (4) involvement in racial disturbance between Mexicans and Blacks (December 14, 1989)
 
 
 [3]
 "Close A" custody, at the time Ramirez was admitted into Pelican Bay, was the designation for those inmates posing the highest security risk. It should be noted, however, that on September 12, 1991, prison authorities amended their regulations and added an even higher level security designation, "Maximum A."
 
 
 [4]
 Ramirez was bumped between custody levels repeatedly from the time he was admitted to Pelican Bay: on July 6, 1990, his custody level was reduced to "Close B"; on August 6, 1990, it was raised to "Close A"; in November 1990, it was reduced to "Close B"; on March 1, 1992, it was again raised to "Close A"; on August 20, 1992, it was lowered to "Close B." Although Ramirez contested in prison grievances nearly every one of his reassignments to Close A, he only contests the March 1, 1992, reassignment in this appeal
 
 
 [5]
 The dates of these states of emergency are: January 18, 1990, to March 16, 1990; April 11, 1990, to May 7, 1990; August 7, 1990, to September 4, 1990; April 24, 1991, to June 18, 1991; November 7, 1991, to December 9, 1991; January 7, 1992, to April 27, 1992; May 18, 1992, to July 16, 1992; August 11, 1992, to August 28, 1992; and April 12, 1993, to a date not specified in the record
 
 
 [6]
 Both the January 18, 1990, and April 11, 1990, emergencies were declared after Northern and Southern Hispanics attacked each other in Prison Facility A. The August 7, 1990, and April 24, 1991, emergencies were called after violence erupted involving a number of races, including Northern and Southern Hispanics, Whites, Blacks, and Puerto Ricans. The November 7, 1991, January 7, 1992, and May 18, 1992, emergencies were declared after Hispanics and Blacks attacked one another. The reasons for the August 11, 1992, and April 12, 1993, declarations of emergency are not evident from the record
 
 
 [7]
 Although Ramirez challenged Helsel's order, Ramirez withdrew his grievance after the lockdown was lifted
 
 
 [8]
 Ramirez's appeal of Johnson's decision to impose the non-Hispanic rule was denied. In their letter denying the appeal, the prison officials explained that they had ascertained that the Hispanics involved in the January 24, 1992, incident were the aggressors and that they could not risk releasing Hispanics from the same Building as those involved in the incident, for fear of repeat violence
 
 
 [9]
 Although the district court noted that the chart did not correlate with the state of emergency reports, see Tentative Opinion at 8 n. 9, the chart may still correlate with the incident reports upon which it was based (though these reports are not in the record)
 
 
 [10]
 As the rationale for Ramirez's March 1, 1992, increase in custody, the board cited the "ongoing management problem with inmates of Hispanic background." Ramirez's custody level was reduced back to "Close B" on August 20, 1992
 
 
 [11]
 More specifically, the board reviewed 136 Southern Hispanics and 24 Northern Hispanics; all 78 inmates whose custody levels were adjusted were Southern Hispanics
 
 
 [12]
 It is normal procedure, when a lockdown is lifted, for the inmates to be released in groups of 40, where they are then observed for a period of time before being released into the general population
 
 
 [13]
 This was the basis upon which the officials denied Ramirez's April 22, 1993, appeal of these restrictions
 
 
 [14]
 Ramirez named as defendants James Gomez (the Director of the California Department of Corrections), Jack Reagan (Chief Inmate Appeals Officer), Charles Marshall (Warden of Pelican Bay State Prison), C.J. Johnson (Associate Warden of Pelican Bay State Prison), Jourden (Program Administrator of Facility A), Helsel and Lawrence (Program Administrators of Facility B), and Linfor, Dillard, Bush, and Galbraith (all Correctional Counselors). The district court granted summary judgment for defendants Marshall, Gomez, and Reagan. The remaining individuals will hereafter be referred to as "defendants."
 
 
 [15]
 Neither party disputes that prison security is a "legitimate penological goal." See, e.g., United States v. Williams, 791 F.2d 1383, 1387 (9th Cir.), cert. denied sub nom. Sears v. United States, 479 U.S. 869 (1986) (holding that institutional security is a "compelling" interest)
 
 
 [16]
 We do not believe that reliance on Gilbraith's study runs afoul of the presumption against the use of demographic data to justify prison actions based on race. See Bills v. Dahm, 32 F.3d 333, 336 (8th Cir.1994) (cautioning "against the use of demographic data to justify a regulation that potentially might effect the violation of a constitutional right."). Gilbraith's study was based solely on incident reports involving the same inmates who were later governed by the prison's race-based policies; this is not a case where statistics drawn from a different or much larger population were applied to a subset of the population. We believe that Bills was aimed at the evil inherent in the latter situation
 
 
 [17]
 Thus, even were we to give full effect to the California Civil Code § 2600 (1987), which was in effect throughout the time period relevant to this appeal and which tolerated deprivations of inmate's constitutional rights only if "necessary" for "security," (the pre-Turner standard), see id., we believe that the extreme circumstances present in this case justify the defendants' actions even under this stricter standard. We are, moreover, not convinced that the California legislature did not intend the statute to be implicitly repealed by Turner since it later amended § 2600 to track Turner 's language. See Cal.Civ.Code § 2600 (1994)
 
 
 [18]
 Indeed, of the 12 incidents in Facility B that Gilbraith's study covered which involved more than one inmate, 10 were intra-racial